# BEGELMAN, ORLOW & MELLETZ

ROSS BEGELMAN
MARC M. ORLOW
PAUL R. MELLETZ :
JORDAN R. IRWIN
REGINA D. POSERINA
DANIEL S. ORLOW

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2015 JUL 23 P 3: 08

Attorneys at Law

Cherry Hill Professional Building
411 Route 70 East, Suite 245
Cherry Hill, New Jersey 08034

(856) 428-6020
(215) 235- 6020
FAX
(856) 428-5485

E-MAIL - LAWPI@AOL.COM
www.begelmanorlow.com

MEMBERS NEW JERSEY & PENNSYLVANIA BARS
*MEMBER NEW JERSEY & DISTRICT OF COLUMBIA BARS
**MEMBER NEW JERSEY, PENNSYLVANIA &
NEW YORK BARS

July 23, 2015

**HAND DELIVERED**
United States District Court
For the District of New Jersey
Office of the Clerk
United States Court House
1 John F. Gerry Plaza
Camden, New Jersey 08101

## Re: Under Seal, In the Name of the United States vs. Under Seal
## Civil Action No. 08-CV- 2126 (JBS)

Dear Sir/Madam:

This is a Qui Tam Action under which the Complaint and Exhibits ("Original Complaint") were filed Under Seal on April 29, 2008. An Amended Complaint, along with the Exhibits, was filed Under Seal on August 16, 2013 ("First Amended Complaint"). Both the Original Complaint and the First Amended Complaint contain personal identifiers and protected health information that is privileged and protected.

The United States, by letter dated July 17, 2015, gave Relator and the Court notice of their declination to intervene and provided a proposed Unsealing Order. Enclosed for filing, please find a redacted version of the First Amended Complaint which was filed with the Court on or about August 16, 2013.

The Exhibits in both of the Complaints are the same and are quite voluminous and all should remain under seal as referenced in the redacted version of the First Amended Complaint in that they all contain protected health information.

Please file the redacted version of the First Amended Complaint. The exhibits which have also been under seal exhibits should remain sealed once the Unsealing Order is issued along with all other documents, including both the unredacted Original Complaint and unredacted First Amended Complaint.

If you have any questions or concerns regarding this matter, please do not hesitate to contact this office.

Respectfully submitted,

**BEGELMAN, ORLOW & MELLETZ**

By:_____

Marc M. Orlow, Esquire

cc: David Dauenheimer, Esquire
Honorable Jerome B. Simandle

**RECEIVED**

JUL 2 3 2015

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

AT 8:30_____M
WILLIAM T. WALSH CLERK

| | |
|---|---|
| Victoria Druding, Barbara Bain,<br>Linda Coleman, and Ronni O'Brien<br>IN THE NAME OF THE<br>UNITED STATES<br>GOVERNMENT PURSUANT TO<br>THE FALSE CLAIMS ACT, 31<br>U.S.C. SECTION 3730,        and<br>the State of New Jersey | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : **DOCKET NO. 1:08-CV-2126 (JBS-AMD)** |
| Plaintiff,<br><br>vs.<br><br>Care Alternatives<br><br><br>Defendant. | : <br> : **UNDER SEAL** <br> : <br> : **FIRST AMENDED** <br> : **QUI TAM  COMPLAINT** <br> : <br> : <br> : |

Plaintiff-Relators hereby file this First Amended Qui Tam Complaint pursuant to Section 31 U.S.C. Title 3729 and 3730 and pursuant to Title 28 Section 1331 as well as in that it is a civil action arising under the laws of the United States, and the New Jersey False Claims Act §2A:32C-3a et seq and hereby states as follows:

## I. Parties

1.      The Plaintiffs/Relators are four individuals, all who are former employees of Defendant, as follows:

A.      Victoria  Druding, RN, PhD ("Druding"), is an individual residing at 4062 Spruce Avenue, Egg Harbor Township, New Jersey, 08234.  Druding was previously employed as a Regional Manager by Care Alternatives.

B.      Barbara Bain ("Bain") is an individual residing at 50 Kent Avenue, Marlton, New Jersey, 08053. Bain was previously employed as a Chaplain by Care Alternatives.

C.      Linda Coleman ("Coleman"), is an individual residing at 50 Kent Avenue,

-1-

Marlton, New Jersey, 08053. Coleman was previously employed as a RN Case Manager by Care Alternatives.

   D. Ronni O'Brien ("O'Brien"), is an individual residing at 3188 Burnley Place, Holland, PA, 18966. O'Brien was previously employed as a community liaison/marketing representative by Care Alternatives. Druding, Bain, Coleman, and O'Brien are collectively referred to as Relators. The Relators were all members of the South West team of Defendant in New Jersey.

  2. Defendant is Care Alternatives, Inc. which is, upon information and belief, a corporation organized and existing under the laws of the State of New Jersey with their home office located at 70 Jackson Drive, Suite #200, Cranford, NJ 07016. Defendant is a for profit hospice that services patients throughout the State of New Jersey. Their census is primarily facility based with close to 95% of their patient census being in facilities. Defendant is a certified Medicare provider and a Medicaid provider, and has been providing hospice services in long-term care and private homes since 1995.

  3. Defendant, from an operating, marketing and organizational perspective, has the State of New Jersey divided into five regions identified as the North, the Northwest, the South, the Southwest and the Central Regions. Each region has their own Interdisciplinary Team which consists of a Medical Director(s), Regional Manager (RM), RN Case Managers, Social Workers, Chaplain and Bereavement, Volunteers, and Aides. Each Region also had their own Community Liaisons who act as marketers.

  4. Defendant conducts and operates a very aggressive marketing program that includes the State Administrator, the CEO, the CFO, each respective RM, each respective Community Liaisons and other members of Care Alternatives ownership. Monthly strategy meetings are conducted by Defendant in which each team, along with the Regional Manager and Community Liaison present their current successes as well as reasons for a drop in referrals and plans/goals for that month's referrals.

  5. Each week, each region has a marketing conference call that included the RM, the

-2-

Community Liaisons, the Administrator, the CEO and other owner members. This is a highly charged, very focused call. The primary goal was to have the Liaisons report admissions and pending referrals. Each Community Liaison had to meet a monthly quota. The CEO and Administrator often stated in these telephone calls *"...do what you have to...."* , *".....take them lunch...', '.....buy them dinner.... ", "....bring me bodies...."*, *".....what do we need to promise them (for a referral).... ".*

6.     Various staff members in each Region were rewarded for meeting admission goals with gift cards, meal or bonuses. The staff bonus structure was based on referral/admission growth.

7.     In addition to the marketing efforts, admission criteria, continued length of stay, appropriate services, medical records, certifications and re-certifications, and other business practices were manipulated or falsified to accommodate a higher rate of billing.

## II. Jurisdiction

8.     This Court has jurisdiction pursuant to Title 42 Section 132a-7a as well as Section 31 U.S.C. Title 3729 and 3730 in that this is a civil action arising under the laws of the United States.

## III. Venue

9.     The venue is proper in this District by a virtue of Title 28 Section 1391(b) in that the Defendant maintains a principal place of business in the District.

## IV. Factual Background

### A.  The Medicare Guidelines and Criteria Regarding Hospice Care

10.     Medicare and it's Intermediaries have specific guidelines regarding what illnesses as well as the criteria, signs and symptoms that support a diagnosis that qualifies a patient for admission into a hospice program. These are objective "fact based" signs and symptoms which are necessary to support the diagnosis. If a patient does not meet these standards they are to be deemed to be not eligible for medicare assistance. A copy of these guidelines are attached hereto and marked as Exhibit "A" and are hereinafter collectively referred

-3-

to the "Hospice Eligibility Guidelines."

11.     The Hospice Eligibility Guidelines also contain specific criteria regarding the re-certification of patients to remain on hospice. This re-certification, if signed by the Medical Director, acts as a certification and verification to Medicare that the patient continues to meet the specific criteria. Medicare has outlined specific time frames for the reassessment and re-certification of patients for hospice care pursuant to the Hospice Eligibility Guidelines.

12.     Defendant has acted in a fraudulent manner by directing its staff as well as its Medical Directors to manipulate and/or change a patient's diagnosis to accommodate and qualify a patient for certification and recertification that would otherwise not be eligible.

13.     Medicare is specific with regards to the guidelines for admission of the Dementia or Alzheimer patient to hospice. Defendant has had many patients admitted to it's hospice program that did not meet these criteria.

14.     "Inpatient Level of Care" and "Continuous Care" are elevated levels of care that Medicare has specific eligibility criteria for as a condition of payment. The reimbursement for these levels of care is much higher than general hospice care. Defendant manipulates these circumstances to increase the number of patients on these elevated levels of care thereby increasing revenues. Staff was strongly encouraged and/or directed to maintain at least a ten percent average of patients on an elevated level of care.

15.     Care Alternatives used the elevated levels of care as a marketing tool to facilities. This benefitted the facility by increasing the staffing ratio in their facility and at times they benefitted financially.

16.     Medicare specifically states that the members of the interdisciplinary team that are necessary for the hospice team to function as well as to care for the patient. The Medical Director was often absent from the Interdisciplinary Team Meeting but would sign certifications and recertifications at a later date.

17.     Nursing Care Plans that are to be changed when changes occur was not

-4-

done as well as the required implementation.

18.     Documentation is never to be altered or re-created, yet this was often done to complete the medical record. A consultant was hired to review the medical records and direct staff to re-write to accommodate standards. Staff was requested to change diagnosis, observations, dates and symptomatology in order to meet criteria for hospice.

19.     Hospice Eligibility Guidelines of Medicare specify that patients are to be discharged from the hospice program if they are no longer eligible. A review of Care Alternatives records will demonstrate that patients were admitted that were not only inappropriate for admission but remained inappropriate throughout the treatment.

20.     Aggressive marketing as well as an unlimited budget was encouraged to increase the census. Meals, gifts and facility perks were utilized to increase business.

21.     Promises of increased staff, full time RNs, reimbursements for various items, luncheons, dinners and inservices were promised and delivered to facilities.

### III. The False Claims

#### *A. Summary*

##### 1. Improper Certifications For Admissions, Recertifications and False Statements Consisting of Altered and/or Newly Created Documentation, and Inappropriate Use of Elevated Levels of Care

22.     Relators believe that Care Alternatives has fraudulently billed Medicare for services rendered by engaging in the following actions:

        a.    Admitting patients for hospice who did not meet Federal guidelines/criteria and therefore were an inappropriate admission

        b.    Certified patients as appropriate for hospice care who did not meet Federal criteria for hospice

        c.    Requested staff (Registered Nurses) to change the hospice diagnosis or manipulate the facts to make the patient "fit" and provide an acceptable

-5-

diagnosis.

d.    Re-certified patients for continued hospice who did not meet the criteria

e.    Altered documentation to adjust for egregious deficits in diagnostic guidelines

f.    Reconstructed missing documentation to accommodate for lost documentation or documentation that never existed

g.    Instructed staff (Registered Nurses) to "find a reason to maintain a patient on hospice"

h.    Use of a hospice diagnosis that was not valid

I.    Inappropriately used the Inpatient provision for hospice patient care

j.    Inappropriately used the Continuous Care provision for Hospice care

k.    Promised facilities elevated levels of care for their patients in return for referrals

l.    Promised facilities extra staffing; additional aides; additional days for aides and a full time nurse in exchange for referrals

m.    Held Federally required Interdisciplinary Team Meetings without the required staff present

n.    Medical Directors often came to the Interdisciplinary Meeting late or not at all. Medical Director would sign recertifications and certifications without knowledge of patient or an appropriate discussion

o.    Experienced frequent billing problems with facilities with regard to elevated level of care reimbursements

p.    Billed for services not rendered or admission that was not Care Alternatives

q.    Promises for what could not be delivered often resulted in multiple service delivery failures

-6-

r.      Total patient census represents a huge disproportionate of facility patients (95%) to home care.  This is a direct result of the ownership structure of Care Alternatives who sister company is Care One long term care facilities and Partners Pharmacy for services long term care facilities

s.      While maintaining a Compliance Officer did not have Compliance as part of their orientation or part of their RN Case Manager Orientation and Training

## 2. Violation Of Stark Rules and Anti-Kickback Statute

23.     In addition to the above, Relators believe that Care Alternatives has also fraudulently billed Medicare for services rendered by engaging in the following actions:

a.      Ignored or did not recognize Stark rules

b.      Gave a facility a large sum or money in order to maintain patients at that facility

c.      Operated an extremely aggressive marketing initiative that included dinners, gifts, promises and money which exceeded the safe harbor on non-monetary compensation of 300 per facility per year.

24.     The Phase I Stark Regulations created an exception providing that certain relatively low valued, non-monetary compensation offered by a Designated Health Services (DHS) entity to a physician or medical provider, such as occasional gifts or meals, would not give rise to a financial relationship implicating the Stark Law. In order to invoke the exception, the non-monetary compensation cannot exceed $300 in value per year. Additionally, the compensation must not (1) be solicited by the physician or his or her practice, (2) be determined in a manner that takes into account the volume or value of DHS referrals or other business he or she generates for the DHS Entity, or (3) violate the federal Anti-Kickback Statute or other federal or state laws relating to billing or claim submission. The only substantive change made by the Phase II Regulations is that, in order to keep the annual dollar limit up to date, the $300 ceiling

-7-

will be adjusted each calendar year by the increase in the Consumer Price Index-Urban All Items (CPI- U) for the 12-month period ending the preceding September 30. CMS also reiterates that the $300 ceiling may not be aggregated among physicians within a medical group for purposes of furnishing a more expensive item or service to the group.

### B. Specific Case Examples of Fraudulent Claims

25.     Set forth below is a summary of specific patients and occurrences of the fraud and false claims described in paragraphs 22 and 23 above.

#### I. Inappropriate Admissions

1.          : In the hospice program for 2 years with End Stage Renal Disease. Attending physician was Dr. Uwewemi who refused to recertify the patient for Hospice

2.          . A patient that was transferred to the Southwest team from the South team who was not appropriate for hospice care. The reason the patient was transferred to the SW team was the result of "deal" made with the mother of the patient to give her son inpatient care in the facility in exchange for the hospice admission. Despite objections, Relators were told to admit the patient.

          Admitted as an End Stage Alzheimer patient at the Sterling House in Deptford. Patient did not meet criteria at the time or during recertifications.

3.          Patient at Innova Mt. Laurel. She was admitted as End Stage Dementia but did meet criteria. Patient actually was psychotic. Nurse was told to recertify patient and find a reason to keep her on the program. Nurse was also told to "back date the paperwork".

4.          Innova Mt. Laurel, facility wanted patient on program. Admitted as ES Dementia but did not meet criteria; patient was

-8-

able to speak, make needs known, feed self and counted the sugars in his coffee.

5.  ▮▮▮▮▮▮▮▮ Innova Mt. Laurel, admitted with ES Dementia, did not meet criteria.  Patient was able to walk, talk, make needs known and was helpful to other patients.

6.  ▮▮▮▮▮▮▮▮ Buttonwood Center, admitted as ES Dementia; Patient could make her needs known, feed self, stand at will, had frequent conversations.

7.  ▮▮▮▮▮▮▮▮ Cadbury. Admitted as ES Dementia, there were no supporting symptoms.  Diagnosis changed to debility and decline.

8.  ▮▮▮▮▮▮▮▮ Innova Mt. Laurel, Hospice diagnosis was Dementia but patient was actually a psychiatric patient.  He was able to feed himself, he was continent and communicated his needs.

9.  ▮▮▮▮▮▮▮▮ Heritage House; Admitted as ES Dementia when she was able to let her needs be known and ambulate without assistance.  Her diagnosis was changed to Debility and Decline without facts to support such.

10.  ▮▮▮▮▮▮▮▮ Voorhees Center; admitted with ES Dementia when at the time she could make her needs known and was very verbal.

11.  ▮▮▮▮▮▮▮▮ Millhouse LTC; Admitted as ES Alzheimer but was custodial care.

12.  ▮▮▮▮▮▮▮▮ Voorhees Center; admitted for Debility and Decline; could walk, talk and periods of weight gain.  Attending physician wanted patient discharged from hospice.

13.  ▮▮▮▮▮▮▮▮ Kennedy Health Care; admission did not meet criteria.  Was patient of the Medical Director CareAlt hospice.

-9-

14.      ██████████ES Cardiac without appropriate clinical support. Diagnosis changed several times to keep patient on program.

15.      ██████████Cadbury; Diagnosis changed several times to keep patient on program despite lack of criteria.  Family given many "extras" to maintain client on hospice.

### *ii. Altered and/or newly created Documentation*

26.    Documentation was constantly "missing".  When documentation was not located, which was often, the missing document was "re-created".  A consultant was hired to review the medical records in preparation of a possible State audit or CHAP review.  She instructed professional to "re-write" documents in order to support diagnosis or give symptoms to support diagnosis. .

27.    Staff was requested to change diagnosis of patients that after the medical record was reviewed it was obvious that patient was not appropriate for the program.

28.    Staff was often call to the Cranford office for the purpose of "re-write of documentation" according to directions given by others. Approximately July 28, 2007 the SW Regional Manager spoke to Sue Coppola, Compliance Officer, regarding the requests to "fix Charts".  The Regional Manager expressed her concern for the legally of this practice.  The Regional Manager was told that the Compliance Officer would look into it.

### *iii. Inappropriate Length of Stay/Inappropriate Re-Certification*

29.    Approximately 30 to 40% of all the patients on the census did not meet criteria. Regional Manager was requested to review the medical records of any patient with a stay of over 365 days. The purpose was to identify symptoms that would justify the patient admission criteria as of that time.  All of these patients were inappropriate at the time of their admission.  Regional Manager was told by Administrator that it was not important that the patient did not meet criteria at the time of admission; no surveyor looked back that far.

-10-

### *iv. Inappropriate Use of Elevated Levels of Care*

29.     Inpatient level of Care was used as a bargaining chip for facilities for the gain of referrals.  Often patients did not meet criteria.

30.     Continuous Care was also promised to facilities and families for various reasons; some compliant and some not.  However, it was used as the administration saw appropriate.

31.     Continuous Care was taken from one patient and given to another due the referral percentage from the latter facility.

32.     Care Alternatives instituted a rule of <u>daily</u> calls from the nurses to the Regional Manager to report elevated level of care.  Care Alternatives insisted that no less than 10% of the patients were to be an elevated level of care.

33.     An email was sent by David Glick, owner, to the Regional Managers instructing us to increase our elevated level of care to increase revenues.

### *v.  Margin versus Mission*

34.     Marketers/community liaisons were told to do what ever was necessary to "bring in the bodies".  To do this Defendant's  made promises of elevated levels of care, extra aides, full time nurses, reimbursement for non-hospice specific needs, lunches, dinners, bonuses, gifts were utilized without discrimination.

35.     Several facilities (e.g. Morris Hall) were given extraordinary consideration for any request due to the high number of referrals.  An example is a treatment for patient care that is outside the hospice philosophy of care and is considered aggressive care was paid for by Care Alternatives because the administrator at Morris Hall threatened to withdraw referrals.

36.     Care Alternatives paid a patient                    A $100 a month to do activities.

37.     Care Alternatives paid Cadbury (LTC and ALF) a large sum ($20,000) to correct a "billing" error and maintain patients within their facility.

-11-

38.    Care Alternatives lost an account (Friend Home) due to billing irregularities regarding elevated level of care. Care Alternatives offered a cash settlement that was refused.

39.    A New Jersey licensed nurse was sent to Pennsylvania to admit a patient to the program even though she was not licensed to practice in Pennsylvania.

40.    Care Alternatives fill for two days for services for a patient that they did not admit and later learned was a patient of Hospice of New Jersey.

41.    The fundamentals of Compliance are not part of the Care Alternative philosophy. Compliance is not included the "RN Case Manager; Orientation and Training Manual"

### *vi. Stark/ Anti - Kickback Laws*

42.    In approximately May 2007 the SW Regional Manager approached the Compliance Officer, Sur Coppola, and questioned her regarding the marketing practices and Care Alternative ownership as it related to the Stark Laws. The Compliance Officer was unfamiliar with the Stark law. They were joined by Jeff Kolmer, CFO. He appeared to be familiar with the Stark laws. The Regional Manager was told there were no issues or problems with regard to compliance with this law. However, at the next monthly meeting David Glick an owner who is an attorney but not licensed in New Jersey gave everyone a quick "compliance summary" that included some elements of the Stark Law. However, despite this, no business practices were changed.

43.    Gifts, lunches, dinners, additional staff, and other designed perks were offered to physicians, administrators, director of nurses, social workers, who could supply referrals. Limits on spending were set on a monthly based upon the marketer's referral/admissions or as a response to trouble spots.

44.    Receipts were entered monthly into an electronic system that tracked the amounts and use for each liaison.

45.    Community Liaisons daily reports reflected thank you gifts for referrals, meals for staff to induce referrals and dinners for physicians and owners of facilities to induce referrals.

-12-

46.     Liaisons were instructed by Care Alternatives administration "to be careful what was written in their daily report and to never write about "service failures". Were at some point told not to write about gifts but just to do it....do not document.

47.     When a service failure (no aide of nurse) occurred in a facility, the Liaisons were instructed to take gifts and meals to the facility.

48.     Liaisons were instructed by the Care Alternative administration to inform facilities that if enough patients were referred Care Alternatives would maintain a full time nurse in the facility. This promise was also made with regard to nursing aides.

49.     Deliberately misrepresented nursing assignments. Aides and/or nurses were always reassigned to facilities with higher referral bases.

50.     Liaisons were told to use Continuing Education Programs for facility staff as a marketing tool. However, if the facility did not refer enough patients as determined by the Care Alternative administration, then the scheduled education program would be canceled. (Buckingham Place, Kennedy Healthcare and Lutheran Home as examples)

51.     Liaisons would often have to resolve public relations issues with facilities due to improper billing of Medicare as a result of a change in the patient's level of care. If a patient was placed on inpatient care status and the facility was not notified, the facility did not receive proper reimbursement. There are specific cases where Care Alternatives had used financial settlements to appease the facilities. (Millhouse, Cadbury and Friends Home as an example)

52.     Care Alternatives' hospice patient was admitted to Robert Wood Johnson hospital from a facility. Care Alternatives did not obtain a contract with the hospital but continued to bill Medicare for services. RWJ Hospital accused Care Alternatives of fraudulent billing.

53.     Care Alternatives will offer some of the nursing facilities a per diem rate for the use of incontinent and other supplies as an incentive.

54.     Arcadia Nursing Home was compromised by Care Alternatives billing practices when confronted by a patient's family for being charged for room and board when they were told

-13-

that the patient was on inpatient status.

55.    Patients were placed on the Inpatient level of care but were not seen daily as directed by Medicare.

## V. The False Claims

## Count I

## False Claims Act, 31 USC 3729(a)

56.    A false claim is defined as follows:

Title 31 of the United States Code, section 3729(a) provides that any person who:

(1)    knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)    knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)    conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $11,000.00, plus 3 times the amount of damages which the Government sustains because of the act of that person.

57.    Defendant's actions as set forth above constitutes the making of false claims to the United States Government and is a violation of 31 U.S.C. 3729(a)(1)(2) and (3).

58.    Pursuant to 31 U.S.C. 3729(a), any person who violates the provisions set forth herein, is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the U.S. Government sustains as a result of Defendant's making of false claims as herein above set forth.

-14-

**WHEREFORE**, Plaintiff requests that the Court enter an award in favor of Plaintiff and against the Defendant for all sums authorized under and pursuant to 31 U.S.C. 3729(a).

## Count II

## Violations of the New Jersey FCA

59.     The allegations of paragraph 1 through 58 are incorporated herein by reference as if set forth at length.

60.     Pursuant to N.J.A.C. 10:53A-4.2, entitled "Basis of payment--hospice providers" New Jersey will reimburse approved hospice providers as follows:

> (a) The Division reimburses an approved hospice provider for those hospice services related to the terminal illness and included in the beneficiary's plan of care according to the methodology and indices in section 1814(i)(1)(C)(ii), 1814(i)(2)(B), and 1814(i)(2)(D) of the Social Security Act.

61.     For patients covered by New Jersey Medicaid, defendant, who is an "approved hospice provider" submitted claims for payment to New Jersey Medicaid.

62.     As alleged more fully above, these submissions to New Jersey Medicaid were false, and were made knowingly.

63.     Defendant  violated the New Jersey FCA in the following respects:

a.  violated the New Jersey FCA §2A:32C-3a by knowingly presenting or causing to be presented to an officer or employee or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.  violated New Jersey FCA §2A:32C-3b by knowingly making, using or causing to be made or used a false record.

WHEREFORE, Plaintiff requests that the Court enter an award in favor of Plaintiff and against the Defendant for all sums authorized under and pursuant to New Jersey FCA §2A:32C .

-15-

Respectfully Submitted

**BEGELMAN & ORLOW, P.C.**

BY:_____

Ross Begelman, Esq.

Marc M. Orlow, Esq.

# UNDER SEAL

# EXHIIT A

# UNDER SEAL

# EXHIBIT B

# UNDER SEAL

# EXHIBIT C

# UNDER SEAL

# EXHIBIT D

# UNDER SEAL

# EXHIBIT E

# UNDER SEAL

# EXHIBIT F

# UNDER SEAL

# EXHIBIT G

# UNDER SEAL

# EXHIBIT H

# UNDER SEAL

# EXHIBIT I

# UNDER SEAL

# EXHIBIT J

# UNDER SEAL

# EXHIBIT K

# UNDER SEAL

# EXHIBIT L

# UNDER SEAL

# EXHIBIT M

# UNDER SEAL

# EXHIBIT N

# UNDER SEAL

# EXHIBIT O

# UNDER SEAL

# EXHIBIT P

# UNDER SEAL

# EXHIBIT Q

# UNDER SEAL

# EXHIBIT R

# UNDER SEAL

# EXHIBIT S

# UNDER SEAL

# EXHIBIT T

# UNDER SEAL

# EXHIBIT U

# UNDER SEAL

# EXHIBIT V

# UNDER SEAL

# EXHIBIT W

# UNDER SEAL

# EXHIBIT X

# UNDER SEAL

# EXHIBIT Y

# UNDER SEAL

# EXHIBIT Z