IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VICTORIA DRUDING, BARBARA BAIN, LINDA COLEMAN, and RONNI O'BRIEN, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff-Relators, | Civil Action No. 08-2126(JBS/AMD) |
| v. | |
| CARE ALTERNATIVES, INC., | **OPINION** |
| Defendant. | |

APPEARANCES:

Regina D. Poserina, Esq.
Ross Begelman, Esq.
Russell D. Paul, Esq.
BEGELMAN & ORLOW, P.C.
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
        -and-
Sherrie Savett, Esq. (pro hac vice)
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, PA 19103
        Attorneys for Plaintiff-Relators Victoria Druding, Barbara
        Bain, Linda Coleman, and Ronni O'Brien

Steven L. Penaro, Esq.
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
        -and-
William Herman Jordan, Esq. (pro hac vice)
Jason Daniel Popp, Esq. (pro hac vice)
ALSTON & BIRD LLP
1201 West Peachtree Street, Suite 4200
Atlanta, GA 30309
        Attorneys for Defendant Care Alternatives, Inc.

David Edward Dauenheiner
U.S. ATTORNEY'S OFFICE
DISTRICT OF NEW JERSEY
970 Broad Street
Newark, NJ 07102
        -and-
William Edward Olson
DEPARTMENT OF JUSTICE
CIVIL DIVISION
175 N. Street, NE
Washington, DC 20004
        Attorneys for Interested Party United States of America

## Table of Contents

I.    INTRODUCTION.............................................. 3

II.   FACTUAL AND PROCEDURAL BACKGROUND........................ 4

      A.    Background......................................... 4

            1.    Defendant Care Alternatives.................. 6

            2.    Plaintiff-Relators........................... 9

      B.    Hospice Care and the Medicare Hospice Benefit....... 12

      C.    Procedural History................................. 15

      D.    The Evidence....................................... 17

            1.    Testimony And Documents About Defendants
                  Allegedly Admitting Ineligible Patients........ 17

            2.    Plaintiff-Relators' Testimony Involving
                  Allegations of Alteration.................... 26

            3.    Dr. Jayes' Expert Report..................... 27

            4.    Dr. Hughes' Expert Report.................... 29

III.  STANDARD OF REVIEW....................................... 29

IV.   THE FALSE CLAIMS ACT..................................... 30

V.    DEFENDANT'S MOTION TO DISMISS............................ 32

VI.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.................. 36

            1.    Plaintiff-Relators Must Put Forth Evidence of
                  "Objective Falsity".......................... 36

            2.    Plaintiff-Relators Have Not Adduced Sufficient
                  Evidence of Objective Falsity................ 43

VII.  CONCLUSION............................................... 47

**SIMANDLE,** District Judge:

## I.    INTRODUCTION

Plaintiff-Relators in this qui tam action are former employees of Defendant Care Alternatives, Inc. ("Care Alternatives" or "Defendant"), a provider of end-of-life hospice care throughout New Jersey. They bring claims on behalf of the United States under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., alleging that Defendant fraudulently billed Medicare and Medicaid by routinely admitting and recertifying inappropriate patients for hospice care. [Docket Item 12.] The United States investigated Plaintiff-Relators' claims for more than seven years, but ultimately declined to intervene in this matter. [Docket Item 15.] The United States, however, remains an "interested party" pursuant to 28 U.S.C. § 517. [Docket Item 153.]

Currently pending before the Court are Defendant's motions to dismiss [Docket Item 126] and for summary judgment. [Docket Item 128.] The central issues in Defendant's motion to dismiss are whether Plaintiff-Relators failed to comply with 31 U.S.C. § 3730(b)(2), which requires that a relator must submit to the Government a "written disclosure of substantially all material evidence and information the person possesses," and, if so, whether dismissal of the Amended Complaint is warranted here. In the alternative, Defendant seeks summary judgment on several

independent bases: (1) Plaintiff-Relators' allegations of falsity have insufficient evidentiary support; (2) there is insufficient evidence that Defendants submitted legally false claims; (3) Plaintiff-Relators have not satisfied the FCA element of "materiality;" and (4) Plaintiff-Relators have not adduced any evidence of scienter under the FCA. For the reasons discussed below, the motion to dismiss will be denied, while the motion for summary judgment will be granted.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Background

Plaintiff-Relators bring this <u>qui tam</u> action on behalf of the United States for alleged violations of the FCA in

---

[1] Pursuant to Local Civil Rule 56.1, the Court distills this version of the facts from the First Amended <u>Qui Tam</u> Complaint (hereinafter, "Am. Compl.") [Docket Item 12] when appropriate, Defendant's Statement of Undisputed Material Facts [Docket Item 131], Plaintiff-Relators' Response in Opposition to Defendant's Statement of Undisputed Material Facts [Docket Item 144-7], Defendant's Reply to Plaintiff-Relators' Response [Docket Item 160], and related exhibits and documents attached thereto.

The Court will, however, only consider properly documented citations in Plaintiff-Relators' "Counterstatement of Material Facts." [<u>See</u> Docket Item 144-8.] In addition to requiring the opponent of summary judgment to "furnish, with its opposition papers, a responsive statement of material facts," which Plaintiff-Relators filed [<u>see</u> Docket Item 144-7] and the Court will consider as stated above, Local Civil Rule 56.1 permits the opponent of summary judgment to "furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition." <u>See</u> L. Civ. R. 56.1 (emphasis added). Plaintiff-Relators' Counterstatement does

4

not comply with this rule. The Counterstatement reads like argument, either untethered to specific cites to the record or citing to material in the factual record that does not support the generalized arguments in the Counterstatement.

While Plaintiff-Relators' Counterstatement is technically separated by numbered paragraphs and cites record evidence at the end of each paragraph, many paragraphs contain numerous sentences, including up to nine sentences in at least two instances (see, e.g., ¶¶ 91, 93), and fails to identify in any meaningful way which sentence in each paragraph is purportedly substantiated by which affidavit and/or other document submitted in connection with the motion. The Court is unable to easily discern whether each sentence (i.e., statement) in the Counterstatement is, in fact, supported by the voluminous record, which stands nearly three feet high, and will not endeavor to do so here. See Decree v. United Parcel Serv., Inc., 2009 WL 3055382, at *5 (D.N.J. Sept. 18, 2009) ("The Court further agrees with UPS that Plaintiff's 'Counterstatement of Material Fact' is unwieldy at best and violates Rule 56.1's insistence that facts be set forth in separately numbered paragraphs and that factual allegations be supported with citation to the record.").

This Court has invested a great deal of time in examining the parties' submissions, but there are limits beyond which the Court must rely on the advocates' substantial compliance with their obligations in summary judgment practice in a complex factual case. "The purpose of the Rule 56.1 statement is for the parties to identify the facts relevant to the pending motion so the Court may determine whether a genuine dispute exists without having to first engage in a lengthy and timely review of the record." Vibra-Tech Engineers, Inc. v. Kavalek, 2011 WL 111417, at *2 (D.N.J. Jan. 13, 2011). "[S]trict compliance with Local Rule 56.1 helps the Court and the parties insure the proper application of summary judgment standards." Fifth v. State Farm Ins. Co., 2014 WL 1253542, at *1 (D.N.J. Mar. 25, 2014). Again, the Counterstatement does not make the Court's job any easier because it seldom attempts to delineate which specific statement is supported by which piece of record evidence, nor does it comply with the Local Rules. Accordingly, because the Court is not equipped to search the volume of this record to seek support for Plaintiff's generalized Counterstatement, the Court will consider only those factual assertions for which direct record support is cited.

connection with reimbursement claims that Defendant submitted to
Medicare and Medicaid between 2006 and October 23, 2007.
Plaintiff-Relators generally allege a concerted effort by
Defendant to bring in patients to its residential facilities who
were not actually eligible for hospice care coverage under
Medicare, notwithstanding that each patient was certified as
hospice eligible by an independent physician. (See generally Am.
Compl.) Specifically, the Amended Complaint identifies 15
patients whose medical records allegedly did not support a
finding of terminal prognosis. (Id. at ¶ 25.)

### 1. Defendant Care Alternatives

Defendant Care Alternatives provided hospice care to
patients throughout New Jersey. (Veltri Dep. [Docket Item 128-6]
at 25:1-4, 76:4-78:1; see also Spoltore Dep. [Docket Item 128-4]
at 21-1-26:25, 46:12-47-8.) To that end, Defendant employed a
variety of clinicians, including registered nurses, chaplains,
social workers, home health aides, and therapists, and worked
with independent physicians who served as hospice medical
directors.[2] (Spoltore Dep. at 75:1-8; see also Care Alternative's

---

[2] Defendant did not employ the physicians who certified its
patients for the hospice benefit. (Spoltore Dep. at 59:8-60:2.)
Rather, these physicians were either independent contractors or
agents of contractors (in the case of hospice medical directors)
or not affiliated with Care Alternatives at all (in the case of
physicians who served only in an attending capacity). (Id. at
37:13-23; see also Veltri Decl. [Docket Item 128-6] at ¶ 4.)
Compensation for medical directors was fixed, set in advance,

Polices regarding Hospice Services [Docket Item 128-5] at 7, 10-17, 26-29, 38-39.) Together, these clinicians formed so-called "interdisciplinary teams" (hereinafter, "IDTs"), which met twice a month to review patient care plans, identify any particular patient needs, and discuss patients who were up for re-certification. (Spoltore Dep. at 149:25-150:15.) The IDTs also provided integrated care and services pursuant to individualized patient plans of care. (Id. at 21:15-26:26; see also Policies at 1.) The medical directors who were part of Defendant's Southwest Region IDT during the relevant period were Dr. Wadawa, Dr. Uwewemi, and Dr. Dignam. (Druding Dep. [Docket Item 144-3] at 23:13-25:1.)

According to Care Alternatives Hospice Administrator Loretta Spoltore ("Spoltore"),[3] Care Alternatives had well-established compliance, quality assurance, training, and auditing programs that were designed to ensure "continuous improvement" and "strove to make sure that what [the company was

---

and did not vary based on the number of patients a physician certified for hospice. (Id. at ¶ 5.) According to Plaintiff-Relator Druding, however, Care Alternatives kept score of each medical director's patient referrals and, if doctors did not provide enough referrals, Care Alternatives parted company with the doctors. (Druding Dep. at 224:21-225:5.)

[3] Spoltore was the person responsible for overseeing the day-to-day operations of Care Alternatives' clinical program for New Jersey from November 2005 through January 2010. (Spoltore Dep. at 8:7-11:6.)

doing] was at or above national standards." (Spoltore Dep. at 94:16-24; see also Veltri Dep. [Docket Item 128-7] at 45:13-46:1.) Spoltore also testified that Care Alternatives devoted significant resources to ensuring that clinicians created thorough patient medical records. (Spoltore Dep. at 114:21-117:12.)

Care Alternatives' Susan Coppola ("Coppola")[4] led quarterly medical record audits to ensure that they were complete and contained documentation required by company policy. (Coppola Dep. [Docket Item 128-8] at 17:13-18:11, 56:19-58:4.) Nurses, full-time auditors, and regional managers assisted with these auditing efforts and, if deficiencies were identified, it was generally the regional manager's responsibility to develop and implement corrective action plans. (Id. at 78:13-80:12; Spoltore Dep. at 74:8-75:12, 114:21-117:12.)

It was Care Alternatives' practice to provide education to staff members of "every policy and procedure, every audit form, every paper" in use by Care Alternatives. (Coppola Dep. at 96:21-97:3.) Care Alternatives employees generally received compliance training on an annual basis. (Spoltore Dep. at 95:25-96:14.) Moreover, newly-hired nurses were provided compliance

---

[4] From 2006 to 2011, Coppola worked in the compliance department at Care Alternatives, ultimately reaching the level of Chief Compliance Officer. (Coppola Dep. at 12:3-23.)

orientation and then educated by their individual teams, other nurses, social workers, and chaplains so that they understood the standards of care and practice for Care Alternatives. (Id. at 34:13-35:22; see also Coppola Dep. at 97:4-97:19.) Care Alternatives' compliance training was "an ongoing educational process." (Coleman Dep. [Docket Item 130-2] at 30:17-31:2.)

In addition to its internal compliance efforts, Care Alternatives was audited by (and conferred accreditation by) Community Health Accreditation Partner ("CHAP") a non-profit, third-party accreditation agency that conducted on-site surveys of Care Alternatives. (Coppola Dep. at 14:1-7.) To that end, Care Alternatives required that all patient medical records be timely delivered and stored in its headquarter offices in Cranford, New Jersey in the event CHAP visited for an on-site review of Care Alternatives' program on short notice. [Docket Item 144-5 at 2.] Care Alternatives hired a consultant, Toni Swick, to review the medical preparation of any possible State audit or CHAP review. (Veltri Dep. at 145:1-146:6.)

### 2. Plaintiff-Relators

Plaintiff-Relators Victoria Druding, Linda Coleman, Barbara Bain, and Ronni O'Brien are former Care Alternatives employees. (Am. Compl at ¶ 1.)

a.  *Victoria Druding*

Victoria Druding ("Druding") was employed by Care Alternatives as a Regional Manager of the Southwest Region for almost six months, from April 17, 2007 through September 6, 2007, when she quit without giving notice. (Druding HR File [Docket Item 128-11] at 1-2; Druding Dep. at 23:1-23:18.) As Regional Director, Druding was responsible for management of the clinical team, which included nurses, social workers, chaplains, and directors. (Id. at 23:13-25:1.) She was also responsible for ensuring that IDT meetings were scheduled and held in a timely manner. (Id.)

b.  *Linda Coleman*

Linda Coleman ("Coleman") was employed by Care Alternatives as a Registered Nurse ("RN") Case Manager in the Southwest Region of New Jersey from April 2004 to September 2007. (Coleman Dep. at 9:18-10:1, 12:20-14-8.) As RN Case Manager, Coleman's duties were to "visit patients wherever they were. . . [and] trying to develop relationships for more referrals." (Id. at 8:15-21.) According to Coleman, her job "was to be the coordinator for patient care, . . . [which] involved making sure the patient was in a safe environment, had a caregiver, had a physician that was willing to work with hospice, medications necessary, pulling in the rest of the team. . . . It was my responsibility to make sure that that all happened in a timely

fashion for the care and comfort of the patient." (Id. at 14:18-15:6.)

c. *Barbara Bain*

Barbara Bain ("Bain") was employed by Care Alternatives as a Chaplain in the Southwest Region of New Jersey from December 28, 2003 to 2007. (Bain Dep. [Docket Item 130-3] at 8:15-9:4, 10:20-11:11, 12:4-6.) According to Bain, her job was more spiritual than religious, and she was responsible for helping patients feel good with themselves and repair their relationships with a church, their family, or themselves. (Id. at 15:8-17.) Bain testified that, as a member of the IDT, she always participated in the IDT meetings where patient care and hospice eligibility were discussed. (Id. at 25:19-26:18, 32:10-33:17.)

d. *Ronni O'Brien*

Ronni O'Brien ("O'Brien") was employed as a Community Education Liaison for the Southwest Region of Care Alternatives New Jersey. (O'Brien Dep. [Docket Item 128-15] at 11:17-12:21.) O'Brien's job was to bring in patient referrals and admissions, and she reported to marketing director Colleen Swick, (id. at 10:16-24), and she regularly participated in weekly marketing phone calls with Colleen Swick and Care Alternatives CEO Sam Vetri. (Id. at 73:4-74:15.) O'Brien was not a clinician and had

no training or responsibility for evaluating patients for hospice eligibility. (Id. at 39:7-15.)

**B.    Hospice Care and the Medicare Hospice Benefit**

Congress established the Medicare Hospice Benefit ("MHB") in 1983. See 48 Fed. Reg. 56008 (Dec. 16, 1983). Under federal regulations, hospice[5] care is considered palliative care, meaning it is "patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering," see 42 C.F.R. § 418.3, and it is designed around "an interdisciplinary approach to provide a variety of services, including medical, social, psychological, emotional, and spiritual, with the goal of making a terminally ill person as physically and emotionally comfortable as possible," see 48 Fed. Reg. 56008.

A patient who has been certified as eligible for hospice and who elects to receive hospice care voluntarily waives the right to Medicare payment for curative treatment, and instead receives only palliative care to manage pain or other symptoms

---

[5] Between January 23, 2006 and 2011, Medicare Hospice regulations specifically defined "hospice" as "a comprehensive set of services described in 1861(dd)(1) of the [Social Security] Act, identified and coordinated by an interdisciplinary group to provide for the physical, psychosocial, spiritual, and emotional needs of a terminally ill patient and/or family members, as delineated in a specific patient plan of care." [Docket Item 144-1 at 2-35.]

of their terminal prognosis. See 42. U.S.C. § 1395d(2)(A). A Medicare beneficiary is eligible for the MHB if his or her attending physician and a hospice medical director certify that the individual is terminally ill.[6]  42 U.S.C. § 1395f(a)(7)(A)(i) (eff. Jan. 1, 2005). That certification should be "based on the physician's or medical director's clinical judgment" and must include "clinical information and other documentation that support the medical prognosis" and "a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b).

The MHB provides two 90-day benefit periods for eligible patients, followed by an unlimited number of 60-day benefit periods. 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.21(a). After a patient is initially certified by hospice by an attending physician **and** a hospice medical director, the patient need only be recertified for subsequent benefit periods by an attending physician **or** hospice medical director. 42 U.S.C. § 1395f(a)(7)(A)(ii); 42 C.F.R. § 418.22.

The Centers for Medicare & Medicaid Services ("CMS"), which is responsible for administering the MHB, has stated that:

---

[6] "An individual is considered to be 'terminally ill' if the individual has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A) (eff. Dec. 29, 2007); see also 42 C.F.R. § 418.3.

Recognizing that prognoses can be uncertain and may change, Medicare's benefit is not limited in terms of time. Hospice care is available as long as the patient's prognosis meets the law's six month test. This test is a general one. As the governing statute says: 'The certification of terminal illness of an individual who elects hospice shall be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness.' CMS recognizes that making medical prognostication of life expectancy is not always an exact science. Thus, physicians need not be concerned. There is no risk to a physician about certifying an individual for hospice care that he or she believes to be terminally ill.

CMS's Program Memorandum Intermediaries/Carriers, Subject: Provider Education Article: "Hospice Care Enhances Dignity and Peace as Life Nears Its End," CMS-Pub. 60AB, Transmittal AB-03-040 (Mar. 28, 2003).

CMS has not created clinical benchmarks that must be satisfied to certify a patient as terminally ill. See 73 Fed. Reg. 32088, 32138 (June 5, 2008) ("We have removed the term 'criteria' in order to remove any implication that there are specific CMS clinical benchmarks in this [proposed] rule that must be met in order to certify terminal illness.") Instead, CMS has been clear that a patient who stabilizes or improves may nevertheless remain eligible for hospice care. See 75 Fed. Reg. 70372, 70488 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care."); 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We also acknowledge that at

recertification, not all patients may show measurable
decline.").

### C.    Procedural History

On April 29, 2008, Plaintiff-Relators filed the original
Qui Tam Complaint on behalf of the United States in camera and
under seal in accordance with 31 U.S.C. § 3730(b). [Docket Item
1.] On September 15, 2009, the Court ordered the United States
to advise if it intended to intervene or decline to intervene.
[Docket Item 8.] The United States subsequently filed an
application for an order staying and administratively
terminating the action to provide the United States with
sufficient time to investigate the matter and decide whether to
intervene, which the Court granted. [Docket Item 11.] The
Complaint was amended in 2013 to add state law claims under New
Jersey's FCA. [Docket Item 12.] On July 21, 2015 (more than five
years after the case was stayed and seven years after the
Complaint was filed), the United States finally notified the
Court of its decision to not intervene in this action. [Docket
Item 15.] A redacted copy of the First Amended Qui Tam Complaint
was thereafter served upon Defendant on July 29, 2015. [Docket
Item 16.]

On September 25, 2015, Defendant filed its first motion to
dismiss [Docket Item 27], which the Court granted in part and
denied in part in an Opinion and Order dated February 22, 2016.

[See Docket Items 47 & 48.] The Court dismissed without prejudice and with leave to amend Plaintiff-Relators' claims regarding altered documentation and violations of the Anti-Kickback Statute arising under an implied legally false theory under the FCA and the NJFCA, and dismissed with prejudice Plaintiff-Relators' claims alleging violations of the Stark Act and noncompliance with the IDT requirement. Druding v. Care Alternatives, 164 F. Supp. 3d 621, 632-35 (D.N.J. 2016). The Court permitted Plaintiff-Relators' to proceed only with their FCA allegations regarding inappropriate patient admissions and recertifications for hospice care. Id. at 630-32.

On March 8, 2016, Plaintiff-Relators notified the Court they were electing not to file a motion for leave to file a Second Amended Complaint, but instead "will proceed in the matter regarding inappropriate patient admission and re-certifications for hospice care as set forth in the [February 2016] Order." [Docket Item 49 at 1.]

Currently pending before the Court are two motions filed concurrently by Defendant: a motion to dismiss pursuant to 31 U.S.C. § 3730(b)(2) [Docket Item 126], and a motion for summary judgment. [Docket Item 128.] Plaintiff submitted opposition to both motions [Docket Items 143 & 144] and Defendant filed reply briefs in further support of each motion. [Docket Items 155 & 158.] With leave of Court [Docket Item 180], Plaintiff filed a

sur-reply brief in opposition to Defendant's motion for summary
judgment. [Docket Item 169] The United States also filed a
"statement of interest" in response to Defendant's motion for
summary judgment [Docket Item 153], pursuant to 28 U.S.C. § 517.
With leave of the Court [Docket Item 179], Defendant filed a
response to the Government's statement of interest. [Docket
Items 168.] The Court convened oral argument on May 10, 2018.
[Docket Item 191.] The pending motions are now fully briefed and
ripe for disposition.

> **D.   The Evidence**

The evidence consists of: (1) deposition testimony and
documents regarding whether Defendant improperly admitted
ineligible patients; (2) deposition testimony alleged to
establish that Defendant directed its employees to alter
certifications; (3) a report by Plaintiff-Relators' expert, Dr.
Jayes, in which he reviewed patient records for 48 Care
Alternatives patients to evaluate the patients' eligibility for
hospice care; and (4) a report by Defendant's expert, Dr.
Hughes, in which he addressed Dr. Jayes' findings.

> 1.   Testimony And Documents About Defendants
>      Allegedly Admitting Ineligible Patients

During discovery, Care Alternatives produced almost 50,000
pages of documents. [Docket Item 128-17.] Plaintiff-Relators
were also deposed, as were several other Care Alternatives

employees. The documents and testimony addressing whether
Defendant admitted ineligible patients are summarized as
follows:

a.   *Druding's Testimony*

Plaintiff-Relator Druding testified that patient A.P. could
"walk without limitations, without assistance," "could talk as
well as you and I are talking right now," was "always . . . able
to [string together multiple sentences in a conversation," "was
gaining weight," and "her weight was going up instead of down."
(Druding Dep. at 198:3-5, 198:17-18, 199:5-11.) According to
contemporaneous nursing assessments which Druding herself
authenticated (id. at 214:21-215:3; 218:11-20), however, Druding
documented that the same patient was "wheelchair restricted
[which] means they're restricted to the wheelchair, they're not
going anywhere without the wheelchair," had lost 43 pounds while
on hospice, and that the "Undersigned [Druding] has deterimined
patient remains hospice appropriate as evidenced by . . . weight
loss despite a rigorous feeding program . . . [increased]
lethargy, increase sleeping, decreased communication, increase
in need for assistance, decrease [in] socialization." (See
Nursing Assessment [Docket Item 130-5] at 2-7.) Notwithstanding
these discrepancies, as discussed infra, Druding insists that
she never falsified documentation in patient medical records.
(See Druding Dep. at 53:20-54:13; 63:18-64:1; see also Pl.'s

Response to Def.'s Second Request for Admission [Docket Item 126-3] at ¶ 2.)

Druding testified that she knew of a Care Alternatives physician certifying a patient as terminally ill when the physician did not believe it to be true, but could not provide any supporting information. (Druding Dep. at 144:20-149:22.) She also testified that she did not know if any physician was pressured by Care Alternatives employees to certify a patient for hospice at all, let alone to certify a patient who was not appropriate for hospice care. (Id. at 109:20-23.)

b.  *Coleman's Testimony*

Plaintiff-Relator Coleman identified two patients, W.B. and H.J., as not appropriate or eligible for hospice. With respect to W.B., Coleman testified that she was instructed by Druding to check off the box for W.B. indicating he was only able to speak six intelligible words or fewer (which would qualify him for hospice care), even though the patient was, in fact, able to speak more than six words (which would not qualify him for hospice care). (Coleman Dep. at 156:14-158:3.) As Coleman explained, "This man did not, was not able, if I understand or reading my notes correctly . . . this was a patient that the facility wanted us to admit because he was above and beyond what they were capable of handling. So this was one of those that was pressed on us to admit this patient, to find a diagnosis and to

put him on, okay to keep our census up and to be accommodating the facility." (Id. at 157:6-16.) With respect to H.J., Coleman testified that he was schizophrenic (which would not qualify him for hospice care), but she was still pressured by Druding to admit the patient for "dementia with depression" (which would qualify him for hospice care) when he did not actually meet the criteria for such a diagnosis. (Id. at 171:19-173:23.) Nevertheless, as discussed infra, Coleman maintains she never altered or falsified any patient's medical records.

Coleman testified that she recalled one instance "where our medical director felt that the patient was questionable [and] . . . maybe a diagnosis needed to be different or whatever." (Id. at 34:1-7.) But Coleman could not recall whether the medical director was Dr. Uwewemi or Dr. Dignam and she could not remember the name of the individual patient. (Id. at 34:9-12.) When asked about any other specific recollections she might have, Coleman testified "I can't give you any names of patients or whatever, but just concerns with, you know, length of stay, type of diagnosis, what the patient is actually able to do." (Id. at 51:1-4.)

Coleman never reported any hospice eligibility concerns to Care Alternative's compliance department (id. at 48:18-49:3), but testified that she complained to her coworkers, including Druding, regarding the working conditions at Care Alternatives,

and voiced her concerns about inappropriate patient admissions, certifications, and recertifications during IDT meetings. (Id. at 50:23-51:4, 53:21-55:4, 65:6-14.)

Coleman recalled that when she raised any concerns at IDT meetings, the physicians' reactions were "[a]ttentive and checking information in the record that they had before them, the copies, and discussing with the regional manager." (Id. at 52:1-5.) Coleman also testified that, in her experience the hospice medical directors were "absolutely" engaged during discussions at IDT meetings about patients and were "[v]ery proactive" (id. at 35:20-25), and that, in her opinion, Dr. Uwemi and Dr. Dignam "absolutely" had the patient's best interest at heart. (Id. at 52:6-16.) Furthermore, Coleman testified that she did not believe that any medical directors or other physicians affiliated with Care Alternatives were certifying patients for hospice when they did not believe that the patients were terminally ill. (See Coleman Dep. at 43:5-19.) ("Q: Did you ever have a belief that either of the physicians you remember, Dr. Dignam or Dr. Uwewemi, were certifying patients for hospice when they didn't believe the patient to be terminally ill? A: No. I really don't think that they did. . . . Q: Did either of the medical directors ever tell you that they didn't think a patient was appropriate for hospice? A: No."). When asked: "Do you have firsthand knowledge of a physician

certifying a patient as terminally ill when the physician did not believe the certification to be true?" Coleman responded, "No." (Id. at 67:8-12.)

        c.   *Bain's Testimony*

Plaintiff-Relator Bain testified that, while she is not a clinician and does not have any formal training on hospice eligibility (Bain Dep. at 16:4-23), in her estimation, 90 percent of patients at Care Alternatives were appropriate for hospice. (Id. at 86:11-87:2.) Bain never reported any concerns about patient eligibility to Care Alternative's compliance department (id. at 81:1-82:18), but she testified that she reported concerns about patient eligibility at IDT meetings. (Id. at 34:14-35-17.) Bain also testified that she had no firsthand knowledge of any physician having certified a patient as terminally ill at Care Alternatives when the physician did not believe the patient to be terminally ill. (Id. at 101:18-102:1.)

        d.   *O'Brien's Testimony*

Plaintiff-Relator O'Brien never reported any concerns about patient eligibility to Care Alternatives' compliance department (id. at 43:6-54:7), but testified that she complained about her concerns regarding hospice eligibility to her supervisor, Colleen Swick. (Id. at 43:3-44:24.) According to O'Brien, Colleen Swick responded that the issue of hospice eligibility

was "not her concern" because she was not a nurse and "could not make diagnoses." (Id.) O'Brien also testified that, on weekly calls, Colleen Swick and Vetri instructed employees to "build the census no matter how they did it" and "bring me bodies." (Id. at 73:4-74:15.) O'Brien testified that she discussed inappropriate hospice admissions with other Care Alternatives regional marketing personnel from other regions of the company. (Id. at 42:22-43:2.)

     e.   *Kelton's Testimony*

In August 2007, Care Alternatives' Lauren Kelton ("Kelton")[7] conducted an internal compliance investigation into complaints that nurses in the Southwest Region of New Jersey felt pressured to admit patients whom the nurses believed were not appropriate for hospice. (Kelton Aff. [Docket Item 128-13] at ¶ 5.) During this investigation, Kelton interviewed several nurses in the Southwest Region who told her that "Druding was the person who was pressuring nurses to admit patients who the nurses did not believe were appropriate for hospice and to maintain patients on elevated levels of care whom the nurses did not believe were appropriate for that level of care." (Id. at ¶ 6.) Specifically,

---

[7] Kelton was the Clinical Director of Care Alternatives New Jersey from 2007 to early 2009 and, in this role, she oversaw clinical operations in New Jersey, which included oversight of and involvement with clinical documentation practices, corrective action plans, and issues relating to hospice admissions and elevated levels of care. (Kelton Aff. at ¶¶ 2-4.)

Kelton stated that "[t]wo nurses informed [her] that they felt from Druding an unwritten, unspoken pressure to maintain patients on elevated levels of care and this was in one case because the nurse was informed by . . . Druding that part of her bonus structure was contingent on the number of patients on elevated levels of care." (Id.) Kelton testified that when she informed Druding about the reports of perceived pressure and asked Druding if she knew by whom these nurses felt pressured, Druding responded "Well I guess by me." (Id. at ¶ 7.) According to Kelton, Druding "resigned before Care Alternatives had the opportunity to terminate her." (Id. at ¶ 9.) Kelton contemporaneously documented these findings in a memorandum dated August 27, 2017. (Id. at ¶ 8; see also Exhibit A to Kelton Aff. [Docket Item 128-13] at 6-7.)

Kelton further testified that, during her entire tenure at Care Alternatives, she never heard or received any report or allegation that any employee or contractor of Care Alternatives, other than Druding, had ever pressured any person to admit a patient who was not appropriate for hospice. (Kelton Aff. at ¶ 10.) According to Kelton, Care Alternatives "was dedicated to abiding by applicable rules and regulations and always endeavored to 'do the right thing.'" (Id. at ¶ 11.) Throughout her time as an employee of Care Alternatives, Kelton "never had any concerns that Care Alternatives was engaging in a practice

of admitting patients who were inappropriate for hospice or keeping patients on elevated levels of care who did not warrant that level of care." (Id. at ¶ 12.)

### f. *Coppola's Testimony*

Coppola, Care Alteratives' Chief Compliance Officer, testified that she never heard or received any report that any nurse had been pressured to document improper hospice diagnoses, and that if she had received such a report, she would have addressed it immediately and supported the nurse who reported it. (Coppola Dep. at 99:1-18.)

### g. *Spoltore's Testimony*

Care Alternatives Hospice Administrator Spoltire testified that she never received reports from nurses or case managers questioning a patient's appropriateness for hospice or the length of the stay, nor did she ever hear of pressure to admit patients who were not appropriate for hospice. (Spoltore Dep. at 158:12-160:9.)

### h. *Veltri's Testimony*

Care Alternatives CEO Sam Veltri ("Veltri") testified that he never received any reports that Care Alternatives was maintaining patients who were inappropriate for hospice and that if he had received such a report, he would "have taken immediate steps to get to the bottom of that." (Veltri Dep. at 157:10-158:2.)

2.  Plaintiff-Relators' Testimony Involving
    Allegations of Alteration

Druding testified that Toni Swick instructed her "in a
group with regional managers and individually in discussion" to
falsify, alter, or otherwise change medical documentation.
(Druding Dep. at 53:16-18; 63:5-11.) According to Druding,
"[w]hen we audited charts, if we found something that . . . did
not promote compliance, whether it was fact or not, we were to
change it." (Id. at 53:20-24.) Druding testified, however, that
she **never** made these changes herself, including in the case of
A.P. discussed above, because she could have sacrificed her
nursing license if she had. (Id. at 54:9-13.) Instead, Druding
testified, various unnamed "members of the staff," including
nurses, chaplains, and social workers falsified, altered, or
otherwise changed documents "upon instruction." (Id. at 54:17-
20.) Druding could not identify any specific individuals who
falsified, altered, or otherwise changed documents. (Id. at
54:21-55:12; see also id. at 56:7-15.)

Coleman testified that in August 2007 **Druding** directed her
to "make the chart complete," which meant "[w]hatever it
required. If notes were missing, which there were many missing,
they wanted them regenerated you know. . . ." (Coleman Dep. at
80:16-22; 77:1-17; 80:12-14; see also id. at 181:8-14) ("Q: Do
you ever recall being instructed to backdate paperwork? A: Yes.

26

By who? A. Regional manager. Q: Victoria? A: By Victoria.
Sorry.") Coleman testified that, notwithstanding these
instructions, she **never** entered documentation in medical records
that she knew was not true, nor did she know of anyone who did.
(Id. at 89:16-90:16.)

O'Brien testified that she was generally aware of Care
Alternatives employees, including Druding and two unnamed social
workers, going up to "change records" and "write whatever needed
to be written in the charts." (O'Brien Dep. at 62:15-20; 64:5-
24; 65:11-12.) However, O'Brien clarified, "Nobody had said that
they falsified." (Id. at 65:3-6.) O'Brien also testified "I
don't know exactly what they did. I was not there. I was not
privy to see." (Id. at 65:13-14.)

### 3. Dr. Jayes' Expert Report

On August 20, 2017, Plaintiff-Relators' expert, Dr. Robert
Jayes, M.D., prepared a report summarizing a review he conducted
of the medical records for 47 patients whose records Care
Alternatives produced during discovery, including the 15
patients identified in paragraph 25 of the Amended Complaint.
(See Jayes Report [Docket Items 130-6 & 130-7].) In his report,
Dr. Jayes explained that "[d]etermining the prognosis of
patients with a serious terminal illness referred to hospice is
a difficult task that depends on the judgment and experience of
clinicians and the consideration of survival evidence from the

27

literature." (Id. at 1.) "Recognizing this difficulty," Dr.

Jayes looked to guidelines provided with the assistance of

clinical experts from the National Hospice and Palliative Care

Organization in the mid 1990's, as well as "several other

criteria typically employed by hospice professionals," to

determine whether documentation supported certification and/or

recertification of the 47 patients he reviewed for hospice. (Id.

at 1-3.)[8]

According to Dr. Jayes, 214 out of 603 (or 35%) of the

periods of hospice certification periods he reviewed lacked

documentation supporting hospice care. (Id. at 1.) Dr. Jayes

further opined that of the 47 patients whose records he

reviewed, 26 were appropriate for hospice at all times and 16

more were appropriate for at least a part of their stay in

hospice. (Id. at Appendix A.) Of the 15 patients identified in

the Amended Complaint, Dr. Jayes opined that 8 were appropriate

for hospice care for the entirety of their time in hospice while

4 more were appropriate for the majority of the time they were

in hospice. (Id. at 19.) Dr. Jayes also found that at least 3

medical records appeared to be incomplete because those records

---

[8] Defendant indicated that a motion to exclude the testimony of
Dr. Jayes based on unreliable methodology is "forthcoming."
[Docket Item 129 at 26 n. 12.]

were cut off at December 31, 2009 even though the patient apparently remained in hospice. (Id. at 7.)

### 4. Dr. Hughes' Expert Report

For each benefit period where Dr. Jayes determined that a patient was inappropriate for hospice based on his review of the medical records, Defendant's expert, Dr. Christopher Hughes, M.D., reviewed Dr. Jayes' findings. (Dr. Hughes Report [Docket Item 130-1].) In each instance, Dr. Hughes, based on his experience and clinical judgment, found it to be reasonable that a physician would have certified each patient Dr. Jayes reviewed for hospice during the benefit period in question. (Id. at 31-50.)

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all

reasonable inferences in that party's favor. Hunt v. Cromartie, 526 U.S. 541, 552 (1999); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252).

## IV.  THE FALSE CLAIMS ACT

Under the FCA, private individuals can bring qui tam actions on behalf of the government in exchange for their right to retain some portion of any resulting damages award. United States ex rel. Wilkins v. United Health Care Group, Inc., 659 F.3d 295, 298 & n.1 (3d Cir. 2011) (citing 31 U.S.C. § 3729 et seq.). To establish a prima facie violation of the FCA, a plaintiff-relator must prove: (1) falsity; (2) causation; (3) knowledge; and (4) materiality. United States ex rel. Petratos v. Genentech Inc., 855 F.3d 481, 487 (3d Cir. 2017); see also Wilkins, 659 F.3d at 305 ("A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must prove

that '(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.'") (quoting United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004)).

Liability may attach under the FCA on two different theories: the presentment of factually false claims and the presentment of legally false claims. Wilkins, 659 F.3d at 305 (citing United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008)). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." Wilkins, 659 F.3d at 305. Legally false claims may be either express, where the claimant falsely certifies that it is in compliance with regulations, or implied, where the claimant "seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." Id. Under the so-called "implied false certification theory," which Plaintiff-Relators invoke here, a plaintiff must demonstrate that the defendant submitted a claim that includes "specific representations about goods or services provided"

31

which are rendered "misleading half-truths" through "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements." Universal Health Services v. United States ex rel. Escobar, 136 S. Ct. 1989, 2001 (2016).

## V.    DEFENDANT'S MOTION TO DISMISS

Defendant first argues that the Amended Complaint should be dismissed because Plaintiff-Relators failed to comply with the statutory requirements of 31 U.S.C. § 3730(b)(2). [See generally Docket Item 127.] Among other requirements, Section 3730(b)(2) requires a relator to submit to the Government a "written disclosure of substantially all material evidence and information the person possesses." Such information allows the Government to decide whether it will intervene in an action, decline to intervene but permit the relator to proceed, or move to dismiss the complaint. See 31 U.S.C. §§ 3730(b)(2),(c)(2)(A).

According to Defendant, Plaintiff-Relators deliberately withheld material information in its "Written Disclosure of Substantially all Material Evidence and Information with Respect to Alleged False Claims" (the "Written Disclosure Statement"), which was served to the Government around the time the Complaint was filed in April 2008. [Docket Item 127 at 5-6.] Specifically, Defendant maintains that Druding's own deposition testimony revealed that "Druding was the person who directed the conduct

32

falsely attributed to Care Alternatives in the Complaint and that she was the subject of an internal compliance investigation where she admitted to this activity before immediately resigning." [Id. at 5.] According to Defendant, Druding testified at her deposition that she falsified medical records in connection with services provided to one patient, A.P., and this information was not included in the Written Disclosure Statement to the Government. [Id. at 7.] By "deliberately omitting" and "improperly with[holding]" this "material" information from the Written Disclosure Statement, Defendant argues, Plaintiff-Relators failed to comply with their pre-suit disclosure requirements under 31 U.S.C. § 3730(b)(2). [Id. at 6.] In support of its motion to dismiss, Defendant primarily relies on a novel interpretation of the recently-decided Supreme Court case, State Farm Fire & Cas. Co. v. United States ex rel. Rigsby, 137 S. Ct. 436 (2016), as discussed below.

In response, Plaintiff-Relators argue: (1) Defendant lacks "statutory" standing to seek dismissal for a purported violation of 31 U.S.C. § 3730(b)(2) because any injury from a violation of the statute would flow to the Government; (2) the Written Disclosure Statement was not deficient because Plaintiff-Relators gave the Government "substantially all material evidence and information" that they had, which was sufficient for the Government to decide whether or not to intervene; and

(3) even if the Written Disclosure Statement was deficient, dismissal is not an appropriate remedy. [Docket Item 143.]

In Rigsby, the Supreme Court held that a district court **may** (but is not required to) dismiss a qui tam complaint for failure to comply with 31 U.S.C. § 3730(b)(2)'s requirement that an FCA complaint must be filed under seal. Rigsby, 137 S. Ct. at 444 ("In general, the question whether dismissal is appropriate should be left to the sound discretion of the district court.") Notably, the Supreme Court did not discuss the Section 3730(b)(2) requirement that a relator provide the government with "substantially all material evidence and information the person possesses." The Rigsby Court further observed, but did not hold, that the factors outlined in United States ex rel. Lujan v. Hughes Aircraft Co., 67 F.3d 242 (1995), "appear to be appropriate" for evaluating the consequences of a relator's violation of the § 3730(b)(2) deficiency at issue in that case. Rigsby, 137 S. Ct. at 444.

The Court assumes for purposes of deciding this motion to dismiss that Lujan articulated the proper test for dismissal due to a deficient Section 3730(b)(2) written disclosure statement.[9]

---

[9] Plaintiff-Relators argue, unpersuasively, that the Court should look to the six-factor test outlined in Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 867-68 (3d Cir. 1984), rather than the three-factor test outlined in Lujan. [See Docket Item 143 at 22-27.]

Those factors are: (1) the actual harm to the Government; (2) the severity of the violations; and (3) evidence of bad faith. Lujan, 67 F.3d at 245-47. None of these three factors weigh in Defendant's favor.

**First**, Defendant has failed to show that the Government was actually harmed by the supposedly deficient Written Disclosure Statement, and "[t]he mere possibility that the Government **might** have been harmed by disclosure is not alone enough reason to justify dismissal of the entire action." Lujan, 67 F.3d at 245 (emphasis in original). This is especially so where, as here, the Government actively investigated the alleged misconduct for seven years, amassed tens of thousands of records, and ultimately declined to intervene.

**Second**, to the extent the Written Disclosure Statement was deficient, Plaintiff-Relators' alleged violation (i.e., failure to disclose that Druding had, herself, apparently falsified the records of one patient, A.P.) was not necessarily "severe" in the context of a FCA action where Plaintiff-Relators had also identified 14 other patients in the Amended Complaint who allegedly received inappropriate hospice care.

**Third**, despite Defendant's hyperbolic rhetoric, there is no evidence that any omissions in the Written Disclosure Statement were the result of deliberate bad faith or willfulness on Plaintiff-Relators' part.

It also appears there have been no cases in which a defendant won dismissal of an FCA complaint where the purported 31 U.S.C. § 3730(b)(2) violation is a deficient Written Disclosure Statement presented to the Government. According to Plaintiff-Relators, "research reveals **no cases** in which a defendant has successfully sought dismissal for a violation of § 3730(b)(2)'s disclosure requirement." [Docket Item 143 at 16-17] (emphasis in original). The Court's own research efforts have produced similar results.

For these reasons, the motion to dismiss will be denied.

## VI. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its motion for summary judgment, Defendant argues that: (1) Plaintiff-Relators' allegations of falsity have insufficient evidentiary support; (2) there is insufficient evidence that Defendants submitted legally false claims; (3) Plaintiff-Relators have not satisfied the element of "materiality;" and (4) Plaintiff-Relators have not adduced any evidence of scienter under the FCA. Because the Court finds that summary judgment is warranted on the first basis for the reasons described below, the Court need not address Defendant's other arguments.

### 1. Plaintiff-Relators Must Put Forth Evidence of "Objective Falsity"

As an initial matter, the Court finds persuasive the district courts' analyses in United States v. AsercaCare, Inc.

("AseraCare I"), 153 F. Supp. 3d 1372 (N.D. Ala. 2016), United States v. AsercaCare, Inc. ("AseraCare II"), 176 F. Supp. 3d 1282 (N.D. Ala. 2016), and United States ex rel. Wall v. Vista Hospice Care, Inc. ("Vista Hospice"), 2016 WL 3449833 (N.D. Tex.), wherein the trial courts held that, to survive a motion for summary judgment, evidence of "an objective falsehood" is required. See also United States ex rel. Drakeford v. Tuomey, 792 F.3d 364, 383 (4th Cir. 2015) ("[F]or a claim to be considered false under the FCA, the statement or conduct alleged must represent an objective falsehood.") (internal citation omitted); United States ex rel. Yannacopoulos v. General Dynamics, 652 F.3d 818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for purposes of the False Claims Act only if the statement represents an 'objective falsehood.'") (internal citation omitted); United States ex rel. Morton v. A Plus Benefits, Inc., 139 F. App'x 980, 982 (10th Cir. 2005) ("Falsity under the FCA does not mean 'scientifically untrue'; it means 'a lie.' At a minimum the FCA requires proof of an objective falsehood."); United States ex rel. Riley v. St. Luke's Episcopal Hosp, 355 F.3d 370, 376 (5th Cir. 2004) ("The district court concluded, however, that expressions of opinion or scientific judgments about which reasonable minds may differ cannot be 'false.' We agree in principle with the district court

and accept that the FCA requires a statement known to be false, which means a lie is actionable but not an error.").

In AseraCare, the United States intervened in a qui tam action alleging that the medical records of 123 patients at issue in the case did not contain "clinical information and other documentation that support [this] medical prognosis," and thus, the defendant hospice provider's reimbursement claims for those patients were "false." AseraCare II, 176 F. Supp. 3d at 1283. Notably, the government did "not challenge that each claim for each patient at issue had an accompanying [certification of terminal illness] with the valid signature of the certifying physician. Nor [did] the Government point the court to any evidence that any of the documents in the patients' medical records were false; that any information on which the certifying physician relied was incorrect or false; or that the clinicians withheld information from the certifying physicians." Id. at 1285. Instead, the only evidence the government offered to prove falsity of the claims came from the medical records of the patients at issue in the case and through the "testimony of [an expert] who offered **his opinion**, **based on his clinical judgment** after a review of those medical records, about the hospice eligibility of those patients." Id. at 1285-86 (emphasis in original).

After hearing evidence at a jury trial and then granting a new trial based on improper instructions the court gave to the jury regarding "false claims," see AseraCare I, 153 F. Supp. 3d at 1382-85, the Northern District of Alabama held that the government's theory failed as a matter of law because a "mere difference of opinion between physicians, **without more**, is not enough to show falsity." AseraCare II, 176 F. Supp. 3d at 1283 (emphasis in original) (citing United States ex rel. Phalp v. Lincare Holdings, Inc., 116 F. Supp. 3d 1326, 1360 (S.D. Fla. 2015)) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."). "Further, practices that may be improper, standing alone, are insufficient to show falsity without proof that specific claims were in fact false when submitted to Medicare." AseraCare II, 176 F. Supp. 3d at 1283-84 (internal citation and quotations omitted). In other words, the court explained, "[w]hen hospice certifying physicians and medical experts look at the very **same** medical records and disagree about whether the medical records support hospice eligibility, the opinion of one medical expert **alone** cannot prove falsity without further evidence of an objective falsehood." Id. at 1283 (emphasis in original). The court then

granted summary judgment in favor of the defendant hospice

provider. Id. at 1286.[10]

Similarly, in Vista Hospice, the Northern District of Texas

granted summary judgment in favor of a defendant hospice

provider as to false claims allegations alleged by a qui tam

relator who sought to prove that the hospice provider had

submitted false reimbursement claims for inappropriate patients.

There, the evidence consisted of two expert reports, as well as

documents and testimony alleged to establish "a culture of

admitting and maintaining patients who were ineligible for

hospice," including deposition testimony of the relator and

other employees who "describe[d] pressure allegedly imposed on

them and others to falsify information in patient charts, which

allegedly resulted in such information being falsified, and

physicians certifying patients without reviewing patient files."

Vista Hospice, 2016 WL 3449833, at *5; see also id. at *5-11

(summarizing the evidence and expert reports in detail).

First, the court explained that, "[b]ecause a physician

must use his or her clinical judgment to determine hospice

eligibility, an FCA claim about the exercise of that judgment

must be predicated on the presence of an objectively verifiable

---

[10] The Court notes that AceraCare is currently pending on appeal.
See USA v. AseraCare, Inc., App. No. 16-13004 (11th Cir., filed
on May 26, 2016).

fact at odds with the exercise of that judgment, not a matter of questioning subjective clinical analysis." Id. at *17 (citing Morton, 139 F. App'x at 982-83) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."). The court further observed, "[a] testifying physician's disagreement with a certifying physician's prediction of life expectancy is not enough to show falsity." Vista Hospice, 2016 WL 3449833, at *17 (citing AseraCare II and United States ex rel. Fowler v. Evercare Hospice, Inc., 2015 WL 5568614, at *9(D. Colo. Sept. 21, 2015)). Accordingly, the court held that an expert's opinion that "certain of Defendants' patients were ineligible for hospice is insufficient to create a fact issue as to whether physician certifications and resulting claims were false." Vista Hospice, 2016 WL 3449833, at *18.

Next, the court considered relator's proffered evidence regarding the defendant hospice provider's corporate culture and allegations of altered medical documents. As the court observed, the relator produced "some evidence of the Defendants' pressure on their employees to admit large numbers of hospice patients, and that a few employees falsified data on a few specified patient charts. . . ," but failed to adequately "tie[] that evidence to the patients whose charts [the expert] evaluated, nor to the submission of a single false claim." Id. Without

evidence of any such connection, the court found "there is no evidence of the falsity required to establish liability." Id. at 19.

Finally, the court determined that, "[n]o reliable evidence is presented by Relator that any patient was not terminally ill." Id. Although the relator and other non-physician employees "claim that they were involved in or observed the certification of patients who were medically ineligible, . . . eligibility depends on **physician** judgment, and thus, their allegations about patient health cannot support a conclusion that any patient for whom a claim was submitted had a medical prognosis of more than six months." Id. (emphasis in original) (citing United States ex rel. Geschrey v. Generations Healthcare, LLC, 922 F. Supp. 2d 695, 703) ("[T]hat Relator Janus, a social worker, and a nurse agreed that the patient was not appropriate for hospice because she could walk, eat, and talk does not suffice to allege that the doctor's certification that A.W. was appropriate for hospice was fraudulent; it merely alleges that Relator Janus and others disagreed with the doctor's assessment. Relators have not alleged facts demonstrating that the certifying physician did not or could not have believed, based on his or other clinical judgment, that the patient was eligible for hospice care."). The court then granted summary judgment in favor of the defendant

hospice relator as to the false claims allegations. <u>Vista</u>
<u>Hospice</u>, 2016 WL 3449833, at *21.

Again, the Court finds the reasoning in <u>AseraCare</u> and <u>Vista</u>
<u>Hospice</u> persuasive. The logic of these cases is also supported
by the Third Circuit's FCA caselaw. <u>See</u> <u>United States ex rel.</u>
<u>Thomas v. Siemens AG</u>, 593 F. App'x 139, 143 (3d Cir. 2014) ("A
statement is 'false' when it is objectively untrue."); <u>United</u>
<u>States ex rel. Hill v. Univ. of Med. & Dentistry of N.J.</u>, 448 F.
App'x 314, 316 (3d Cir. 2011) ("[E]xpressions of opinion,
scientific judgments or statements as to conclusions which
reasonable minds may differ cannot be false."). And Plaintiff-
Relators cite to no binding authority that directly contradicts
the analysis in either <u>AseraCare</u> and <u>Vista Hospice</u>. Accordingly,
the Court adopts the reasoning of the district courts in these
two well-reasoned and directly on-point cases with respect to
"objective falsity" for purposes of deciding Defendant's motion
for summary judgment.

### 2. <u>Plaintiff-Relators Have Not Adduced Sufficient Evidence of Objective Falsity</u>

As in <u>AseraCare</u> and <u>Vista Hospice</u>, Plaintiff-Relators
identified patients in the Amended Complaint who were allegedly
inappropriate for hospice care. (<u>See</u> Am. Compl. at 25.) As in
<u>AseraCare</u> and <u>Vista Hospice</u>, Plaintiff-Relators conceded that
every patient identified in the Amended Complaint was certified

43

by appropriate physicians for the hospice benefit, as required by 42 U.S.C. § 1395f(a)(7). Druding, 164 F. Supp. 3d at 631. As in AseraCare and Vista Hospice, Plaintiff-Relators have adduced no evidence that any physician received a kickback to certify any patient as hospice eligible, nor have Plaintiff-Relators accused a single physician of certifying any patient whom that physician believed was not hospice eligible. As in AseraCare and Vista Hospice, Plaintiff-Relators instead argue (primarily through an expert witness) that Defendant submitted false claims to the government simply because Defendant is missing adequate medical record documentation to support hospice certification. And as in AseraCare and Vista Home, the Court now finds that Plaintiff-Relators have not adduced evidence of objective falsity from which a reasonable fact finder could conclude that Defendant submitted any false claims for MHB reimbursement as to any of the identified hospice patients identified in the Amended Complaint.

As detailed in Section II.D.1, supra, Plaintiff-Relators' deposition testimony mostly reveals that, contrary to the allegations in the Amended Complaint, the only person who put any direct pressure on nurses or other Care Alternatives employees to admit ineligible patients for hospice was Druding herself. (See, e.g., Coleman Dep. at 156:14-158:3; 171:19-173:23.) This is corroborated by Kelton's August 2007 internal

investigation, which revealed that nurses reported feeling pressured by Druding, and only Druding, to admit patients whom the nurses believed were inappropriate for hospice (see Kelton Aff.), as well as the deposition testimony of several Care Alternatives Employees, including Coppola, Spoltore, and Veltri.

Nor is there evidence of alteration or falsification of any identified patient's record. As noted above, the Court previously dismissed without prejudice Plaintiff-Relators' allegations that Care Alternatives "submitted false claims for reimbursement by presenting to the Government claims based on altered medical records." Druding, 164 F. Supp. 3d at 632-33. Plaintiff-Relators did not seek leave to amend these allegations, instead choosing to "proceed in the matter regarding inappropriate patient admissions and re-certifications for hospice care." [Docket Item 49 at 1.] Nonetheless, Plaintiff-Relators still seek to advance the theory that medical documents were altered or falsified through their deposition testimony. But even then, there is simply no evidence to support Plaintiff-Realtors' theory. Bain and O'Brien testified that they never altered or falsified documents. Coleman testified that she was pressured to alter or falsify documents **by Druding**, but that she nonetheless never altered or falsified any documents. And, most importantly, Druding adamantly maintains that, notwithstanding her contradictory remarks regarding A.P., she

never altered or falsified any medical documents. In sum, no Plaintiff-Relator has identified a single document that was actually altered or falsified by any Care Alternatives employee.

The only remaining evidence of falsity that Plaintiff-Relators have put forth is the expert report of Dr. Jayes. But, as Third Circuit precedent makes clear, the difference of opinion of an expert cannot be false. <u>Hill</u>, 448 F. App'x at 316 ("[E]xpressions of opinion, scientific judgments or statements as to conclusions which reasonable minds may differ cannot be false."). Thus, while the respective expert witness for Plaintiff-Relators (Dr. Jayes) and for Defendant (Dr. Hughes) disagree as to whether they find a reasonable basis for admitting several identified patients into hospice, their diverging opinions do not create a genuine issue of material fact about the falsity of a physician's determinations that the patient meets hospice eligibility where, as here, there is no factual evidence that Defendant's certifying doctor was making a knowingly false determination. This is because the ultimate issue is not whether the certification of hospice eligibility was correct or incorrect, but rather whether it was knowingly false. Moreover, even if Plaintiff-Relators were entitled to rely exclusively on Dr. Jayes' expert report to establish falsity, which they are not, Dr. Jayes opined, in fact, that 12 of the 15 patients identified in the Amended Complaint were

actually appropriate for hospice for at least part of their stay (Jayes Report at Appendix A), and testified that reasonable physicians could differ with his assessment. (See Jayes Dep. [Docket Item 128-23] at 92:6-17; 94:1-5; 282:13-283:1; 283:12-19.) Thus, Dr. Jayes' expert report is plainly insufficient to establish a genuine dispute of material fact as to falsity.

In sum, Plaintiff-Relators have not adduced sufficient evidence of falsity sufficient to raise a genuine dispute of material fact. Accordingly, summary judgment must be granted in favor of Care Alternatives.

## VII. CONCLUSION

In light of the foregoing, the Court will deny Defendant's motion to dismiss and grant Defendant's motion for summary judgment. An accompanying Order will be entered.


**September 26, 2018**            **s/ Jerome B. Simandle**
Date                              JEROME B. SIMANDLE
                                  U.S. District Judge