IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VICTORIA DRUDING, BARBARA BAIN, LINDA COLEMAN, AND RONNIE O'BRIEN, | : <br> : CIVIL ACTION <br> : |
| v. | : No. 08-2126 <br> : |
| CARE ALTERNATIVES, INC. | : |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                 **December 15, 2021**

This False Claims Act action is once again before the District Court on remand from the U.S. Court of Appeals for the Third Circuit. On September 26, 2018, the Honorable Jerome B. Simandle granted summary judgment to Defendant Care Alternatives, Inc. on the ground that the Plaintiff-Relators had failed to show falsity. The Court of Appeals reversed, finding that a sufficient showing of falsity had been made, and remanded the case for consideration of Care Alternative's remaining arguments for summary judgment. Upon review of the record, the Court concludes that Plaintiff-Relators have again failed to produce sufficient evidence to create a genuine issue of material fact on the element of materiality. Summary judgment will therefore again be entered in favor of Care Alternatives.

**CASE HISTORY[1]**

The four Plaintiff-Relators are former employees of Care Alternatives, Inc, a provider of end-of-life hospice services throughout New Jersey. Under Care Alternatives' model,

---

[1] The facts are largely taken from the opinion issued by Judge Simandle on September 26, 2018, reported at 346 F. Supp. 3d 669 (D.N.J 2018) and by the Third Circuit on March 4, 2020, at 952 F.3d 89 (3d Cir. 2020).

Interdisciplinary Teams (IDTs) comprised of registered nurses, chaplains, social workers, home health aides and therapists work together with independently contracted physicians who serve as hospice medical directors, to provide integrated care and services to hospice patients pursuant to individualized care plans. The IDTs meet twice monthly to review patient care plans, identify any particular patient needs and discuss patients whose eligibility for hospice services must be re-certified. The Relators themselves are clinicians who were members of the IDTs. In bringing this action under the False Claims Act, 31 U.S.C. § 3729 (FCA), the Relators allege that in New Jersey between 2006 and October 2007, Care Alternatives admitted patients who were ineligible for hospice care and directed its employees to improperly alter those patients' Medicare certifications to make it instead appear that they *were* eligible to receive services.[2]

The Relators filed the original Qui Tam Complaint on behalf of the United States *in camera* and under seal on April 29, 2008. In September 2009, the Court directed the United States to advise whether it intended to intervene or not. The United States responded by filing an application for an order staying and administratively terminating the action to enable it to investigate and make a decision regarding intervention. That application was granted, and in 2013, Relators amended the Complaint to add claims under New Jersey's False Claims Act, N.J.S.A. §2A:32C-1, *et. seq.* On July 21, 2015, the United States notified the Court that it would not intervene but it nevertheless

---

[2] As explained by the Third Circuit, "Medicare [is] a federally subsidized health insurance program for the elderly and certain disabled persons. … and Medicaid a cooperative federal state public assistance program pursuant to which the federal government makes matching funds available to pay for certain medical services furnished to needy individuals." *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 298-299 (3d Cir. 2011) (citing 42 U.S.C. §§ 1395c and d; §1396).

wished to remain an "interested party" in the proceedings.[3] The Relators thereafter filed a redacted version of the First Amended Complaint on the public docket on July 23, 2015. Care Alternatives moved to dismiss, and on February 22, 2016, the Court granted the motion in part, dismissed Relators' claims regarding altered documentation and violations of the federal Anti-Kickback Statute without prejudice and with leave to amend, and dismissed Relators' claims alleging violations of the Stark Act with prejudice. Memorandum and Order, February 22, 2016, ECF Nos. 47, 48. The Court thereby permitted the Relators to proceed only with their FCA allegations regarding inappropriate patient admissions and recertifications for hospice care. The Relators elected to forego their altered documentation and Anti-Kickback claims and did not further amend their complaint. Letter from Relators' counsel, March 8, 2016, ECF No. 49.

On September 8, 2017, Care Alternatives filed a second motion to dismiss and a motion for summary judgment. Following briefing and oral argument, Judge Simandle denied the motion to dismiss but granted summary judgment finding the Relators had failed to adduce sufficient evidence of objective falsity. As noted, this decision was reversed by the Third Circuit, which held the Relators' medical expert's testimony **was** sufficient to create a genuine dispute of material fact as to falsity and remanded the matter back to the District Court. On May 14, 2020, the Chief Judge of the U.S. Court of Appeals for the Third Circuit reassigned this case to the undersigned pursuant to 28 U.S.C. § 292(b). Care Alternatives petitioned the U.S. Supreme Court for writ of certiorari, and the matter was briefly stayed pending the Supreme Court's ruling on the petition,

---

[3] The United States thus reserved the right to be notified and to give consent to any settlement, dismissal or discontinuance of the action, to receive copies of all pleadings and memoranda filed and to order any deposition transcript or to later intervene in the matter. Order, July 29, 2015, ECF No. 16.

which was denied in February 2021. Following submission of supplemental briefing and oral argument on May 26, 2021, the motion is ripe for adjudication.

**SUMMARY JUDGMENT STANDARDS**

Under Federal Rule of Civil Procedure 56, any party may move for summary judgment on any claim or defense or any part of a claim or defense, and judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…; [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Stone v. Troy Construction, LLC,* 935 F.3d 141, 148, n. 6 (3d Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Salazar-Limon v. City of Houston,* 137 S. Ct. 1277, 1280 (2017) (quoting *Anderson*, 477 U.S. at 249). "In so doing, the court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion.'" *Id.,* (quoting *Scott v. Harris*, 550 U.S. 372, 378, (2007)). "A party will not be able to withstand a motion for summary judgment merely by making allegations." *In re Tribune Media Co.*, 902 F.3d 384, 392-393 (3d Cir. 2018)(quoting *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)). "Instead, the nonmoving party must 'designate specific facts' in the record to 'show that there is a genuine issue for trial.'" *Id,* (quoting *Celotex v. Catrett*, 477 U.S. 317, 324 (1986)). Thus, in order to survive summary

judgment, an opposing party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249.

**DISCUSSION**

The False Claims Act imposes civil liability "for making a false or fraudulent 'claim,' or a false record or statement material to such a claim to obtain payment from the federal government." 31 U.S.C. § 3729 (a)(1)(A) – (G), (b)(2). *United States ex rel. IBEW Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 324 (3d Cir. 2021). "Both the Justice Department and private parties (called 'relators') may bring an FCA action." *Id.*

"The False Claims Act imposes significant penalties[4] on those who defraud the Government." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016). The Act was "meant to reach all types of fraud without qualification that might result in financial loss to the Government." *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). "A False Claims Act violation occurs when a person 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A)). In order to establish a prima facie False Claims Act violation under § 3729(a), a plaintiff must prove: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Wilkins,* 659 F. 3d at 305. And at least in those cases where liability is premised upon a failure to disclose violations of legal requirements, it must be shown the defendant knowingly

---

[4] Specifically, a violator of the FCA "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 …) plus 3 times the amount of damages the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

5

violated a requirement that he knows is material to the Government's payment decision. *Escobar*, 579 U.S. at 181.  Thus, a False Claims Act violation has been said to be comprised of four elements: falsity, causation, knowledge and materiality.  *United States ex rel. Doe v. Heart Solutions, P.C.,* 923 F.3d 308,  317 (3d Cir. 2019).

A claim may be either legally false or factually false.  *Wilkins*, 659 F.3d at 305.  "A claim is legally false when it does not comply 'with a statute or regulation the compliance with which is a condition for Government payment.'"  *Petratos*, 855 F.3d at 486, n. 1 (quoting *Wilkins*, 659 F.3d at 305).  It is factually false "when the claimant misrepresents what goods or services … it provided to the Government." *Id.*  "The term 'material' means 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property;'" and knowledge, (the scienter element) "embraces actual knowledge of the false information, deliberate ignorance of its truth or falsity, and/or reckless disregard of its truth or falsity." *Escobar*, 579 U.S. at 192-193 (quoting 31 U.S.C. § 3729(b)(4)); *Local 98*, 5 F.4th at 324 (quoting 31 U.S.C. § 3729(b)(1)(A)). Proof of specific intent to defraud is not required.  31 U.S.C. §3729(b)(1)(B).

The Relators here are proceeding under the so-called implied false certification theory, which holds that in submitting a claim, a defendant impliedly certifies compliance with all conditions of payment.  *Escobar*, 579 U.S. at 180.  Specifically, they premise their FCA claims upon Care Alternative's failure to provide medical documentation supporting the physician-signed certifications of hospice necessity which are required to obtain payment for hospice services. Relators assert this failure rendered their certifications false thereby violating the Medicare statute and regulations.[5]  Stated otherwise, by failing to notify Medicare that many of its physician-signed

---

[5] Relators invoke 42 U.S.C. § 1395f(a)(7) and § 1395y(a)(1)(C), (which require certification and re-certification every 90 days that an individual is terminally ill and that services for hospice care are "reasonable and necessary for the palliation or management of terminal illness").  They also

hospice certifications did not have medical records documentation properly supporting hospice necessity, Relators claim Care Alternatives misrepresented facts material to the Government's payment decision.

As noted, the Third Circuit has now determined the Plaintiff-Relators have made a sufficient showing of legal falsity through the deposition testimony of their expert witness to survive Care Alternatives' motion for summary judgment. It remanded the matter to this Court for consideration of whether the record contains evidentiary support for the remaining elements: materiality, scienter, and causation.

Turning to the element of scienter first, there is indeed significant evidence in the record of this matter that Care Alternatives had longstanding problems with maintaining necessary and proper documentation and that it was well aware of those problems. In addition to Relators' expert who opined that 45% of the Care Alternatives' files he reviewed "evidenced improper certifications or recertifications and periods of ineligibility for hospice," a number of Care Alternatives' employees and representatives also testified on this point. Every time a member of the IDT visited a patient, the member was required to write a note documenting the visit, although

---

invoke 42 C.F.R. § 418.22, (which specifies what those certifications must contain and that maintenance of a patient's medical records is necessary). Specifically, 42 C.F.R. § 418.22 requires the written certification of terminal illness to be based on the physician's or medical director's clinical judgment regarding the normal course of a patient's illness and must specify that the patient's prognosis is for a life expectancy of six months or less if the terminal illness runs its normal course. 42 C.F.R. § 418.22(b)(1). The regulation further provides:

> Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification as set forth in paragraph (d)(2) of this section. [requiring maintenance of records].

§ 418.22(b)(2).

the notes might not follow the same format from visit to visit. (Dep. of Hospice Administrator Loretta Spoltore, 40, 120-121.) This was in keeping with Care Alternatives' staff member guidelines outlining the medical documentation required by, *inter alia*, the Centers for Medicare & Medicaid Services (CMS). (Spoltore Dep., 29-30, 69, 99, 113-118.) In addition to maintaining these internal guidelines, Care Alternatives' CEO Sam Veltri at one point brought in a trainer to instruct staff on how to write care notes and keep proper documentation. (Spoltore Dep., 62; Veltri Dep., 145-147.)

Care Alternatives also had a quality program overseen by a corporate representative, which was a plan for continuous improvement anchored by periodic chart audits ostensibly to ensure that its nurses, social workers, aides, and other IDT members were completing paperwork appropriately and in compliance with regulations, and to detect and prevent false claims. (Spoltore Dep., 94; Veltri Dep., 31, 45-46.) At least two individuals, Barbara Kemp and Sue Coppolla, were assigned to perform quarterly random chart audits, which were also to be conducted by the regional managers. (Coppolla Dep., 15-17; Spoltore Dep., 94, 102-103, 110; Kemp Dep., 12; Veltri Dep., 34-34.) In 2007, the Compliance Audit Summary for New Jersey state-wide only had data for the first and second quarters. (Spoltore Dep., 111.) For the first quarter, only 68% of the charts audited had all of the indicators (*i.e.,* the data necessary) the auditor was looking for. For the second quarter, only 56.10% of the audited charts did. There were some 20 categories which were to be evaluated under the audit tool, such as admission criteria and coordination of care. (Spoltore Dep., 111-112.) In the first quarter of 2007, 89% of audited charts had all that was needed to satisfy admission criteria; 72% had sufficient criteria for nursing assessments, and 80% had all that was needed to satisfy nursing documentation. For the second quarter of 2007, those figures were 84%, 52% and 54%, respectively. (Spoltore Dep., 113-114.) The results for the Southwest region of

New Jersey were even worse. The overall scores for this region were available for all four quarters of 2007, but the percentage of audited charts containing everything the auditors were looking for was only 56.5% in the first quarter, 53.9% in the second quarter, 54.1% in the third quarter and 43.6% in the fourth quarter. (Coppolla Dep. 68.) With respect to Interdisciplinary Care Plans, for the first and second quarters of 2007, only 19% of the audited charts were compliant with the applicable criteria for IDCP's and only 9% were compliant in the second quarter. (Spoltore Dep., 128.) The opening summary of Care Alternatives' Clinical Record Audit for the Third Quarter of 2007, which was prepared by Auditor Barbara Kemp and reviewed by Director of Compliance Maureen Gilligan, summarized Care Alternatives' recordkeeping problems as follows:

> In addition to documentation issues and information missing that is required for reimbursement, regulatory and accrediting standards (e.g. signed IPOCs), the maintenance of the clinical records is below standard. Information is often not easily retrievable. Numerous records audited contain unnecessary paperwork and excessive duplicate information (e.g. multiple faxes or copies of the same form); sections that are incorrectly filed, and pages falling out that need repair with reinforcements. A major area of concern is that patient information is filed in the wrong chart resulting in serious HIPPA violations.
> …

Exh. 28 to Relators' Resp.to Def.'s Mot. for Summ. J. ECF No. 144.

While both Spoltore, Care Alternatives' Hospice Administrator, and Veltri believed the nurses and other IDT members were documenting their visits per Care Alternatives' policy and that in general, Care Alternatives' documentation on patient charts was compliant, they acknowledged there was a problem with the company's documentation and that further support was needed. (Spoltore Dep., 99-102, 104-105, 119-125, 131-133.) Veltri himself observed, "it was a constant, constant fight to make sure the documentation was good," *i.e.* that it was "accurate," "clinical," "made sense," and "made its way to the charts." (Veltri Dep. 104-105.) In the 2006-07 timeframe, Care Alternatives had no electronic record-keeping system – all notes and records were created and kept on paper. (Veltri Dep. 110; Coppolla Dep. 18.) Veltri sought to

implement an electronic documentation system and while he eventually succeeded, it was not until several years later, as the company did not want to spend the money at that time. (Veltri Dep. 106, 109-110, 112.) In the meantime, when clinical, nurse's, or other notes or documents were found to be missing, Care Alternatives would have its IDT members and other staff search for them and where necessary, travel to the company's main office in Cranford, NJ to complete, supplement or create a late note. (Spoltore Dep. 70-73, 114-118; Veltri Dep. 126-127; Coppolla Dep., 18.) Spoltore issued a directive in 2007 to all Regional Managers to schedule all clinical staff in the Cranford office at least part of one day every other week to ensure that their clinical records were kept current. The directive also instructed the Regional Managers themselves to spend three days per week in the office auditing charts. (Spoltore Dep. 133.) Further, all staff were to turn in their documentation to the Regional Managers during the weekly IDT meetings, and the Managers, in turn, were to transport the paperwork to the Cranford office for filing. (Spoltore Dep. 145, 150, 161-163.)

CEO Veltri further testified that while Care Alternatives was open about the results of its audits within the company itself, it did not report them to Medicare as there was no requirement that it do so. (Veltri Dep. 126-127.) It was Veltri's view that just because the charts didn't always contain documentation reflecting what care was given to a Care Alternatives' patient, that didn't mean care wasn't provided. He admitted, however, that without the necessary documentation being charted, Care Alternatives had no way of showing what was in fact done. (Veltri Dep. 126.)

The foregoing evidence clearly reflects knowledge on Care Alternative's part that its medical documentation did not always support the physician-signed certifications of hospice necessity and thus did not always comply with the Medicare/Medicaid regulations governing payment. While the evidence shows the company was also taking steps to identify and remedy its

10

compliance problems, Relators have produced ample evidence from which scienter may reasonably be found.

To prevail under the implied false certification theory pursuant to which a defendant impliedly certifies compliance with all conditions of payment, the claim must also disclose the defendant's violation of a material statutory, regulatory, or contractual requirement. *Escobar*, 579 U.S. at 180. The standard for materiality is "demanding," as the FCA is neither "an all-purpose antifraud statute," nor "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)). "[A] material misrepresentation is one that goes to the very essence of the bargain." *Petratos,* 855 F.3d at 489. A defendant may be liable under the so-called implied "false certification theory," when he submits a claim that not only requests payment but also makes specific representations about the goods or services provided and fails to disclose his noncompliance with a statutory, regulatory, or contractual requirement which renders the representations "misleading half-truths." *Escobar*, 579 U.S. at 190, Thus, False Claims Act liability for failing to disclose violations of legal requirements does not turn upon whether those requirements were or were not expressly designated as conditions of payment; it turns on whether they had the effect of inducing the Government to "manifest [its] assent" to the transaction. *Escobar*, at 193. As the *Escobar* Court further explained;

> In sum, when evaluating materiality, … the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were

11

> violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.*, at 2003-2004. Causation, of course, may be shown by Care Alternatives' presentment of the hospice claims at issue for payment thereby causing harm to Medicare if the misrepresentations upon which the claims were based were material. *Heart Solutions*, 923 F.3d at 318. To prevail at summary judgment, "evidence of the actual submission of a false claim" must be adduced. *United States ex rel. Greenfield v. Medco Health Solutions, Inc.,* 880 F.3d 89, 98 (3d Cir. 2018).

While the record evinces Care Alternatives' presentment of hospice claims to Medicare, the element of materiality is problematic for the Relators. To establish this element, Relators have produced an expert report[6] prepared by Al Palentchar, a Certified Public Accountant who spent most of his career as a Financial Investigator with the Special Prosecutions Bureau and Criminal Division of the New Jersey Attorney General's Office attesting, *inter alia*, that $3,609,331.52 of Care Alternatives' charges to Medicare were improper. However, the Court can find no evidence in the voluminous record of this case that Care Alternatives' insufficiently documented certifications had the effect of inducing the Government to "manifest its assent" to the transactions at issue or that the missing and/or insufficiently documented certifications were material to the Government's decision to pay. *Escobar*, 579 U.S. at 192-193. Nor is there any evidence Care Alternatives failed to provide appropriate hospice services to its Medicare/Medicaid-enrolled patients or that there was **no** medical documentation to support its physicians' hospice certifications. At most, the evidence demonstrates that in **some** cases, the medical documentation was not complete or did not accompany the physician certifications that the patients' prognoses were for a life expectancy of six months or less if their terminal illnesses ran a normal course.

---

[6] Exhibit 29 to Relators' Response to Defendant's Motion for Summary Judgment, Doc. No. 144.


Again, the materiality standard is demanding. Although the Government's decision to condition payment upon a certain provision is relevant, it is not automatically dispositive. Proof of materiality can include evidence such as might show knowledge on the defendant's part "that the Government consistently refuses to pay claims in the mine run of cases" where there is noncompliance with a particular statutory or regulatory requirement. Conversely, a showing the Government "regularly pays a particular claim in full despite its actual knowledge that certain requirements were violated, and has signaled no change in position, … is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195. The Government could see what was or was not submitted to it by Care Alternatives along with its claims seeking payment. Nothing in the record of this case suggests the Government ever refused any of Care Alternatives' claims, despite the inadequacy or missing supporting documentation or where compliance with 42 C.F.R. § 418.22 was otherwise lacking.

The Relators argue the Government's continued reimbursement of Care Alternatives for hospice services cannot by itself "conclusively vitiate materiality under the FCA," and because *Escobar* "requires a holistic assessment of a falsehood's capacity to affect the government's payment decisions, the materiality inquiry is a factual question often left for a jury to resolve." (Pls' Supp. Br. in Opp.to Def's Mot. for Summ. J. 9, 10, ECF No. 237). Regardless, this case is before the Court on a motion for summary judgment. It is therefore incumbent upon the Relators to present **some** evidence suggesting the Government's apparent disregard of the inadequacies in Care Alternatives' billing documentation was not the result of its having concluded those inadequacies were immaterial to its decision to make those payments anyway. Indeed, there is no showing here that the Government ever stopped reimbursing Care Alternatives after it was made aware of the false, inadequately supported physician certifications. The Court thus concludes

Relators have failed to create a genuine factual dispute as to the issue of materiality and *a fortiori,* causation.  Hence, summary judgment is appropriately now entered in Care Alternatives' favor.

An appropriate Order follows.

BY THE COURT:

/s/ Juan R. Sanchez
_____
Juan R. Sánchez,		C.J.